Kiriakos, Jeane Giannankakos
998 S. Quincy Cr.
Anaheim, CA 92807
(714) 595-4932

Pro Per

# UNITED STATES BANKRUPTCY COURT

## FOR THE CENRTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

JEANE GIANNAKAKOS, an individual;

Plaintiff and Debtor,

vs.

FREMONT INVESTMENT & LOAN, a
business entity of unknown capacity and
domicile; FREMONT GENERAL CREDIT
CORPORATION, a business entity of
unknown capacity and domicile; LITTON
LOAN SERVICING, LP, a business entity of
unknown capacity and domicile; -
MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC, as a
Nominee for FREMONT INVESTMENT &
LOAN, a business entity of unknown capacity
and domicile; HSBC BANK USA, National
Association, as Trustee, under the Pooling
and Servicing Agreement dated August 1,
2006, ACE Securities Corp., Home Equity
Loan Trust, Series 2006-FM1, Asset Backed
Pass-Through Certificates, an unknown entity
and a successor or assignee in interest;
QUALITY LOAN SERVICE
CORPORATION, a business entity of
unknown capacity and domicile; "998 S.
Quincy Cr., Anaheim, CA 92807," *in rem,*
successors and/or assigns, and all persons

Case No.: 8:10-bk-22675 RK

**KIRIAKOS,JEANE GIANNAKAKOS
VERIFIED ADVERSARY COMPLAINT**

**(TRIAL BY JURY IS DEMANDED)**

CHAPTER 13
ADVERSARY PROCEEDING

claiming by, through, or under such persons and all persons unknown, claiming any legal or equitable right, title, estate, lien or interest in the property described in the complaint named as DOES; and DOES 1 through 50, inclusive ,

,

Defendants.

## **The Parties**

1. At all times hereto relevant, the plaintiff s Kiriakos Giannakakos and Jeane Giannankakos, is an individual resident of the State of California.

2. Plaintiffs are informed and believe, and thereon allege, that at all times hereto relevant Defendant *FREMONT INVESTMENT & LOAN* was a commercial lender doing business within the State of California. Plaintiff is without information or belief as to said Defendants lawful capacity, either currently or at the time of transactions herein alleged, to engage in the business of commercial lending within the State of California.

3. Plaintiff s are informed and believes, and thereon allege, that at all the times hereto relevant Defendant *HSBC BANK USA, National Association, as Trustee, under the Pooling and Servicing Agreement dated August 1, 2006, ACE Securities Corp., Home Equity Loan Trust, Series 2006-FM1, Asset Backed Pass-Through Certificates* was a commercial lender doing business within the State of California. Plaintiff is without information or belief as to said Defendants lawful capacity, either currently or at the time of transactions herein alleged, to engage in the business of commercial lending within the State of California.

4. Plaintiffs are informed and believes, and thereon allege, that at all the times hereto relevant Defendant *MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.* as a

separate corporation that is acting solely as a nominee for the lender doing business within the State of California. Plaintiff is without information or belief as to said Defendants lawful capacity, either currently or at the time of transactions herein alleged, to engage in business within the State of California.

5.  Plaintiff s are informed and believes , and thereon allege, that at all time hereto relevant Defendant *FREMONT GENERAL CREDIT CORPORATION*,  was a business enterprise operating as a professional trustee in regard to mortgage transactions within the state of California. Plaintiff is without information or belief as to said Defendant's lawful capacity. Either currently or at the time of transactions herein alleged, to engage in the business of acting as a professional trustee within the State of California.

6.  Plaintiffs are informed and believes, and thereon allege, that at all times hereto relevant Defendant *QUALITY LOAN SERVICE CORPORATION* was a business enterprise operating as a professional substitute trustee in regard to conducting non-judicial foreclosure within the State of California. Plaintiff is without information or belief as to said  Defendant's lawful capacity, either currently or at the time of transactions herein alleged, to engage in  the business of acting as a professional substitute trustee within the  State of California.

7.  Plaintiffs are informed and believe, and thereon allege, that at all times hereto relevant Defendant in rem, *998 S. Quincy Cr., Anaheim, CA 92807*, (herein after "PROPERTY") consisted of improved, residential real  property situated within this Judicial District of the County of Orange, State of California.

8. Plaintiff  are unaware of the true names  and capacities of individuals and/or entities sued herein under the fictitious names **DOES 1** through **100**, inclusive or, to the extent that the names of such individuals or entities may be known to Plaintiffs, the Plaintiff cannot state with

certainty that a viable cause of action lies herein as against such individuals or entities, or

Plaintiff are unable to allege the elements of such a cause of action, at this time, prior to

discovery, with sufficient specificity to satisfy the requirements of Code of Civil Procedure

§128.7, wherefore said Defendant are herein named in accordance with the provisions of

California Code of Civil Procedure § 474. Plaintiff reserve the right to amend the instant

Complaint to allege the true names and capacities of such fictitiously name Defendants when

the same become known or when it has been ascertained with reasonable certainty that a cause

of action hereunder can be satisfactorily stated and maintained as against each such fictitiously

named individual or entity.

### Interrelationships of Defendant Parties

9.  Plaintiff is informed and believe, and thereon allege, that in committing certain acts

herein alleged, some or all of the Defendants herein named were acting as the agents, joint

ventures, partners, representatives, subsidiaries, affiliates and/or employees of some or all of

the other Defendants, and that some or all of the conduct of such Defendants, as Complained of

herein, was within the course and scope of such relationship.

10. Plaintiffs are informed and believe, and thereon allege, that notwithstanding

incorporation or other formalized capacity, one or more of the Defendants named herein was

formed and operated as a mere shell or conduit for the affairs of other, and that individuals

controlling said Defendants, have at all relevant times used said corporations or other

formalized business entity as a subterfuge and alter ego to further illegal and/or usurious

transactions.

### General Allegations of Material Fact

11. Upon or prior to April 19, 2006, the real property which underlies this action (to wit; Defendant *in rem* "*998 S. Quincy Cr., Anaheim, CA 92807*") was residential real property owned of record by Plaintiff.

12. At all times hereto relevant the property was the principal residence of PLAINTIFF.

13. On or about April 19, 2006, the PROPERTY was encumbered by a Deed of Trust (hereinafter "TRUST DEED") in favor of and for the benefit of Defendant *FREMONT INVESTMENT & LOAN* (hereinafter "LENDER"), which TRUST DEED was recorded as Instrument No. 2006000275213 and 2006000275214 in the Office of the County Recorded of Orange County, California. A true and correct copy thereof is appended hereto as EXHIBIT "1 & 2" and incorporated herein by this reference.

Plaintiff Jeane Giannakakos alleges the following:

## I. INTRODUCTION

4.    Plaintiffs were informed and believes and thereon alleges that on February 16, 2006 in the county of Orange they was told by *Hallmark Escrow Company, Inc.*, escrow officer she was signing loan documents for a loan she would receive.

5.    Plaintiff is informed and believes and thereon alleges that defendant(s) concealed that the Deed of Trust was an investment contact for the sole benefit of the alleged lender.

6.    Plaintiff is informed and believes and thereon alleges that signing of a promissory note (herein called "NOTE") that was included with the Deed of Trust was placed into a REMIC TRUST (*Real Estate Mortgage Investment Conduit*) by way of a "Pooling and Serving Agreement. It is also known as a SPV (Special Purpose Vehicle), that was setup for tax exemption purposes, covered under Internal Revenue Code 860. Whereby a master servicer of the REMIC is appointed.

7.   Plaintiff is informed and believes and based on that information thereon alleges that *HSBC BANK USA, National Association, as Trustee, under the Pooling and Servicing Agreement dated August 1, 2006, ACE Securities Corp., Home Equity Loan Trust, Series 2006-FM1, Asset Backed Pass-Through Certificates is the Master Servicer where my NOTE was placed and converted into a "SECURITY" that was traded on Wall Street.*

8.   Plaintiff is informed and believes that her negotiable instrument within the meaning California Commercial Code §3104(b) changed states when it was placed into the REMIC and securitized.

9.   Plaintiff is informed and believes that once her Note was securitized it lost its security (i.e, the Deed of Trust)!!

10.   Plaintiff is informed and believes that once her alleged loan was converted into a stock and traded on Wall Street it is no longer a loan.

a.   If both the loan and stock exist at the same time, that is known as double dipping.  Double dipping is a form of securities fraud.

b.   Once the loan is traded as a stock, it is forever a stock and it is treated as a stock and regulated by the SEC as a stock.

11.   Plaintiff is informed and believes and based on that information and belief that her Deed of Trust recorded on 4/25/2006 as instrument No. 2006000275213, which states "This Deed of Trust secures a Promissory Note" became invalid when her promissory note was securitized and converted into a stock.

**a.   "IF A TRUST WAS CREATED TO SECURE A PROMISSORY NOTE, AND THAT PROMISSORY NOTE IS DESTROYED.....THEN THAT TRUST IS INVALID. THE TRUST SECURES NOTHING"!!**

12.   Plaintiff is informed and believes that Fremont sold my alleged loan to HSBC BANK USA, National Association, as Trustee, under the Pooling and Servicing Agreement dated August 1, 2006, ACE Securities Corp., Home Equity Loan Trust, Series 2006-FM1, Asset Backed Pass-Through Certificates and forever lost control, ability to enforce or foreclose on my property.  They are just a servicer and not the Real Party In Interest. Rule 17(a).

13.   PLAINTIFFS are informed and believes and based on that information and belief thereon alleges that PLAINTIFFS were induced by LENDER into executing said note, as a way of facilitating LENDER'S perpetration of fraud on unwitting or unsuspecting investors who might subsequently purchase it, take a security interest therein or purchase a beneficial interest in any trust which it may become part of it in the future, under the guise that it was negotiable.

14.   PLAINTIFFS are informed and believes and thereon alleges that LENDER misrepresented, concealed and hid material facts about the contract and its purpose.

      **a. Without a meeting of the minds of the parties on an essential element, there can be no enforceable contract. Hettenbaugh v. Keyes-Oron-Fincher Ins., Inc. (1962, Fla App D3) 147 So 2d 328, Goff v. Indian Lake Estates, Inc. (1965, Fla App D2) 178 So 2d 910**

      **b. In order to form a contract, the parties must have a distinct understanding, common to both, and without doubt or difference. Unless all understand alike, there can be no assent, and therefore no contract. Webster Lumber Co. v. Lincoln (1927) 94 Fla 1097, 115 So 498, Minsky's Follies of Florida, Inc. v. Sennes (1953 206 F2d 1; O'neill v. Corporate Trustees, Inc. (1967) 376 F2d 818**

      **c. Until the terms of the agreement have received the assent of both parties, the negotiation is open and imposes no obligation on either. Goff v. Indian Lake Estates, Inc. (1965 Fla App D2) 178 So 2d 910; Carr v Duval (1840) 39 US 77, 10 L Ed 361**

15.    To date; PLAINTIFFS have seen no evidence that Defendants have fulfilled Defendants' contractual obligation, and common law and statutory duty.

## II.    JURISDICTION AND VENUE

1.    Jurisdiction is conferred on this Court by 28 U.S.C. § 1334 in that this proceeding arises under title 11 of the United States Code, arises in and is related to the above-captioned chapter 13 case under title 11, and concerns property of the Debtors in that case. This proceeding is a core proceeding.

2.    Plaintiff's action for declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

3.    As to the portions of this matter that are non-core proceedings, the Plaintiff consents to the entry of final order in this proceeding by the Bankruptcy Judge.  (Fed. R. Bankr. P. 7008(a).

4.    This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5.    Plaintiff's action for fraud regarding Plaintiff's subject Property, is authorized under the trustee's power pursuant to 11 U.S.C. § 548(a)(1)(B) to have said sale set aside.

6.    This Complaint is also filed under the Truth in Lending Act, 15 U.S.C. § 1601 ("Act") to enforce the Plaintiff's right to rescind a consumer credit transaction, to void the Defendants' security interest in the Plaintiff's home, and to recover statutory damages, reasonable attorney's fees and costs by reason of the Defendant's violations of the Act and Regulation Z, 12 C.F.R. § 226 ("Regulation Z").

## II.    PARTIES

7.    Plaintiff, GIANNAKAKOS, ("Plaintiff" or "GIANNAKAKOS"), is, and at all times mentioned and relevant herein, the owner of a residence located at 998 Quincy Circle, Anaheim, County of Orange, State of California, 92805 (hereinafter subject "Property").

8.    Upon information and belief, Defendant **FREMONT INVESTMENT & LOAN**, an unknown entity, a successor or assignee in interest (hereinafter "FREMONT" or

"Lender" or "Servicer") is, and at all times mentioned and relevant herein a corporation, doing business in the County of Orange, State of California.

9.      Upon information and belief, Defendant, Doe Broker, (hereinafter "Broker") is, and at all times mentioned and relevant herein was and is currently an entity, name unknown, to be determined via discovery, at a date hereafter, prior to trial, doing business in the County of Orange, State of California.

10.     On information and belief, QUALITY LOAN SERVICE CORPORATION CALIFORNIA ("Trustee " or "QLSC") is and was at all times herein relevant, doing business the County of Orange, State of California. At all times mention herein, Trustee was practicing Trustee services for Lender and/or Servicer, doing business in the County of Orange.

11.     LITTON LOAN SERVICING, LP operated as a successor in interest or assignee from FREMONT INVESTMENT & LOAN. The chain of title on the Subject Property reveals that FREMONT INVESTMENT & LOAN failed to record an "Assignment of Deed of Trust" regarding its successor in interest to LITTON LOAN SERVICING, LP, status.

12.     MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FREMONT INVESTMENT & LOAN performed and illegal Assignment of Deed of Trust was recorded on 12/30/2008 with registration No. 2008000593757 with questionable notary text.

13.     A invalid Substitution of Trustee was recorded in the Orange County Recorder's Office that does not comply with California Civil Code Sec. 2934(a)(2). The Substitution carries questionable notary text.

14.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 through 50, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes,

and on that basis alleges, that each of the Defendants designated herein as a DOE is responsible in some manner, way, form and to some extent for the events and occurrences referred to herein, and for the damages resulting to Plaintiff.  At such times as Plaintiff learns the true name and capacity of any Defendant named as a DOE herein, Plaintiff will seek leave of court to amend their complaint to identify said Defendant, and include accompanying charging allegations.

15.    Plaintiff is informed and believe, and thereon allege, that at all times mentioned and relevant herein, each and every Defendant, including said fictitiously named Defendants, was the principal, agent, master, servant, co-venturers, employer or employee of each and every other Defendant, and at all times relevant herein was acting in such capacity. Plaintiff further alleges that the acts performed by them as agents, principals, servants and employees were performed within the course and scope of their authority and employment. Each of the Defendants is in some way responsible for the damages sustained by Plaintiff.

16.    When this complaint references any act of any Defendant or Defendants, such allegation shall be deemed to mean the act of those Defendants named in the particular cause of action and each of them acting, individually, jointly and severally.

### III.   PLAINTIFF'S DEMAND FOR TRIAL BY JURY

17.    Plaintiff  JEANE GIANNAKAKOS hereby demands that this action be tried therefore a jury.

### IV.   FACTS COMMON TO ALL CAUSES OF ACTION

18.    On or about April, 2006, Plaintiff JEANE GIANNAKAKOS engaged the mortgage brokerage services of Broker, for a first note, and deed of trust on subject Property, which is located at 998 Quincy Circle, Anaheim, County of Orange, State of California, 92807 (hereinafter subject "Property").

19.    On or about April 19, 2006, said Note and related First Deed of Trust ("Loan" or "Mortgage"; Loan Number 40421968) on Subject Property was originated with lender FREMONT INVESTMENT & LOAN, ("FREMONT" and/or "Lender" and/or "Servicer"; FREMONT Deed of Trust, Orange County Recorder Document No. 2006000275213).

20.    LITTON LOAN SERVICING, LP operated as a successor in interest or assignee from FREMONT INVESTMENT & LOAN. The chain of title on the Subject Property reveals that FREMONT INVESTMENT & LOAN failed to record an "Assignment of Deed of Trust" regarding its successor in interest to LITTON LOAN SERVICING, LP status.

21.    On   or   about   December   30,   2008,   MORTGAGE   ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FREMONT INVESTMENT & LOAN, SIGNED BY DENISE BAILEY, ASSISTANT SECRETARY filed an Assignment of Deed of Trust purportedly granting, transferring and assigning, partially, or fully, or collaterally said Deed of Trust on Subject Property to *"**HSBC BANK USA, National Association, as Trustee, under the Pooling and Servicing Agreement dated August 1, 2006, ACE Securities Corp., Home Equity Loan Trust, Series 2006-FM1, Asset Backed Pass-Through Certificates**", as beneficial interest on subject Deed of Trust. ("HSBC BANK USA *see* Exhibit "B", Assignment of Deed of Trust, Orange County Recorder Document No. 2008000593757).

22.    Said Loan and related deed of trust Fremont General Credit Corporation a California Corporation as original trustee on Deed of Trust, Orange County Recorder Document No. 2006000275213).

23.    Plaintiff executed said note and deed of trust on or about April 19, 2006, and has and currently occupies subject Property as her primary residential residence, owner occupied.

24.    The Trustee, at the direction of the Lender, filed a Notice of Default on subject Loan, regarding subject Property (Notice of Default, Orange County Recorder Document)

25.     On or about _____, Trustee, at the direction of the Lender, filed a Notice of Trustee Sale on subject Loan, regarding subject Property. Thereafter, Trustee, at the direction of the Lender, scheduled a Trustee foreclosure sale of subject Property for _____, at 12:00 p.m.  (Notice of Trustee Sale, Orange County Recorder Document No. _____).

26.     Plaintiff is informed and believes that the wrongful acts of Defendants include violations of federal and state law before the initiation of the Loan as well as during the servicing period of the Loan:

    a.     Prior to the funding of the Loan, Broker and/or Lender represented to Plaintiff that very favorable loans, loan terms and interest rates were available to her;

    b.     As a result, Broker, and other Defendants convinced Plaintiff to sign the alleged loan documents;

    c.     Plaintiff is further informed and believes that Lender, Broker, and other Defendants knew or intended that Plaintiff was going to receive a loan:

    d.     Plaintiff is further informed and believes that Lender, Broker and other Defendants knew or should have known that her note was going to become a MBS (Mortgage Back Security).

Defendants knew or should have known that in the event of Plaintiff inability to perform on the Loan, prepayment penalties, commissions and other foreseeable charges to Plaintiff would constitute an additional payment stream to the benefit of Defendants.

27.     Although Lender and Broker, and other persons made certain representations regarding the Loan, in actuality, the Loan was not as represented.

28.     Plaintiff is informed and believes that Defendants failed to provide Plaintiff with the proper disclosures required under federal and state law:

    a.     Defendants did not provide to Plaintiff a proper notice of right to cancel at the time of the transaction;

    b.     Defendants did not provide to Plaintiff accurate disclosures of the costs of financing, the Annual Percentage Rate ("APR"), the payment obligations, or

the type of loan at the time of the transaction;

c.   The settlement charges listed on the Good Faith Estimate are lower than those listed on the HUD-1;

d.   Various disclosures and notices, especially with respect to rescission rights, were not provided to Plaintiff at the time the alleged loan documents were signed;

e.   Defendants did not provide to Plaintiff a proper notice of right to cancel subsequent to the time of the transaction; and

f.   Defendants did not provide to Plaintiff accurate disclosures of the costs of financing, the APR, the payment obligations, or the type of loan subsequent to the time of the transaction.

29.   Plaintiff is informed and believes Defendants took unfair advantage of Plaintiff because they knew Plaintiff trusted them and was susceptible to their undue influence:

a.   Plaintiff was a minority home buyer.

30.   Plaintiff is informed and believes that Defendants Lender, Servicer and other Defendants received Qualified Written Requests regarding the Loan from Plaintiff and failed to adequately respond to Plaintiff requests for information.

31.   Plaintiff is informed and believes that Defendants Lender, Servicer and other Defendants failed to fulfill their lawful obligations regarding servicing of the Loan.

32.   Plaintiff is informed and believes that Defendants further took advantage of Plaintiff while Plaintiff made extensive efforts in good faith to resolve the disputed issues while Defendants sought to obtain information for debt collection purposes and to further exert influence over Plaintiff.

33.   Furthermore, Plaintiff is informed and believes that Broker, Lender, and other Defendants and/or their agents breached their duties of care to Plaintiff by not giving full disclosure of what the alleged lender intended of the note.

34.   At the time the alleged Loan was executed, predatory lending behavior

evidenced by Defendants includes, but is not limited to, the following:

    a.    Kickbacks to mortgage brokers;

    b.    Promising specific terms such as a fixed rate loan and switching at closing;

    c.    Structuring loans with payments borrowers cannot afford;

    d.    Forging signatures on loan documents (such as required disclosures);

    e.    Falsifying appraisals;

    f.    High points or padded closing costs;

    g.    Improper broker fees;

    h.    Rushed loan closing;

    i.    Back-dating of documents;

    j.    Failure to give copies of documents to homeowner at closing;

35.    Furthermore, Plaintiff is informed and believes that Broker, Lender, and other Defendants and/or their agents willfully deceived Plaintiff by, among other things, the following:

    a.    Defendants created a note with so many different addenda, riders and disclosures that the contract was incomprehensible to a standard consumer;

    b.    No loan payment examples were provided.

36.    Plaintiff is informed and believes that the loan securitization process has created a situation where no single entity has complete ownership of the Loan, or even sufficient authority to negotiate a workout or modification to the Loan. As a result the Originating Lender, unknown investors and one or more servicers all entered into servicing agreements with an entity that cannot speak for Loan. Servicer represented that it had the right and authority to foreclose on the Subject Property. Plaintiff is informed and believes that this representation was false because all of Servicer's and Servicer's rights regarding the Loan are derivative of rights held by unknown investors whose rights are themselves dependent on the rights of the Originating Lender and Broker who perpetrated the initiation of the Loan. Plaintiff is informed and believes that Servicer and Servicer falsely, wrongfully, and either negligently or intentionally represented to Plaintiff and to others that they had authority to

service, collect, negotiate, work-out, and foreclose the Loan notwithstanding the deficiencies with the Loan.

37.     Plaintiff is informed and believes that the Loan and related contracts contain conflicting terms that are not reasonably comprehensible by a consumer, possibly including but not limited to the Note, Addenda, Trust Deed, Rider(s), TILA, Estimated Settlement Statement(s), Final Settlement Statement(s), Escrow Instruction(s), all containing complicated and in many cases contradictory terms.

38.     Plaintiff relied on the representations of Broker, Lender, and other Defendants as alleged herein because Plaintiff reasonably believed that Defendants are licensed banks, real estate agencies, brokers and/or mortgage companies, and are fiduciaries of Plaintiff, owing Plaintiff duties of utmost care, loyalty, professionalism and to conduct all real estate transactions herein without violating any of the fiduciary duties owed to Plaintiff.

39.     Broker, Lender, and other Defendants breached their fiduciary obligations owed to Plaintiff, were negligent, made negligent misrepresentations, intentional misrepresentations, breached their contract with Plaintiff, were professionally negligent and caused Plaintiff damages.

40.     Plaintiff is informed and believes that Defendants Servicer and other Defendants purchased or otherwise acquired unknown rights and/or responsibilities relating to Plaintiff Loan from Lender at some date unknown to Plaintiff. All such rights and responsibilities depend on the rights of Lender and are meaningless and unenforceable if the rights of Lender are unenforceable.

41.     Plaintiff is informed and believes that Servicer, under Mortgage transfer disclosures 226.2(a)(22); ***For purposes of this section, a servicer of a mortgage laon shall not be treated as the owner of the obligation***.

42.     As a proximate result of Defendants' conduct as herein alleged, Plaintiff sustained damages, including monetary loss, medical expenses, emotional distress, loss of employment, loss of credit, loss of opportunities, attorney fees and costs, and other damages to be determined at trial. As a proximate result of Defendants' breach of duty and all other

actions as alleged herein, Plaintiff has suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and mental and physical pain and anguish, all to Plaintiff damage in an amount to be established at trial.

43.     Plaintiff damages included but are not limited to excessive fees, charges, penalties and interest.

44.     Each Defendant herein is responsible for the acts of other Defendants and their predecessors based on the doctrine of respondeat superior. Further, each Defendant herein is responsible for the acts of other Defendants because each Defendant negligently supervised the other Defendants and is therefore directly responsible for the acts of the other Defendants.

45.     All Defendants are agents, employees and other fiduciaries of each other as set forth within. Each of the wrongful acts by Defendants against Plaintiff set forth within were done in the scope of employment. Defendants were acting as agents and employees and in the transaction of the business of the employment or agency when performing their wrongful actions. Defendants are therefore directly, jointly and severally liable to Plaintiff for the actions of Broker, Lender, Servicer, the employees of said parties, and all other Defendants as set forth within.

46.     The aforementioned conduct of Defendants was an intentional misrepresentation, deceit, or concealment of a material fact known to Defendants with the intention on the part of Defendants of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff rights, so as to justify an award of exemplary and punitive damages, as well as attorney fees and costs.

## QUALIFIED WRITTEN REQUEST

47.     The Complaint contains Plaintiff's name, premises address, account numbers, and demands in connection with the subject Loan as to each originating lender and each subsequent servicer:

a.   that each lender, servicer, creditor or owner justify any legal right to service, own, be named "creditor" and provide proof that Defendants, and each of them in fact has ownership or authority regarding the Loan;

b.   that each lender, servicer, creditor or owner provide Plaintiff an opportunity to inspect all the original Notes and Deeds relating to the Loan;

c.   that each lender, servicer, creditor or owner state and prove that it did not violate Real Estate Settlement Procedures Act ("RESPA") regarding the Loan, or admit that it violated RESPA;

d.   that each lender, servicer, creditor or owner identify each and every transfer or sale of any rights in the Loan, the Subject Property or the Note, along with a copy of each notice provided to Plaintiff of such transfer or sale;

e.   that each lender, servicer, creditor or owner in possession of any Truth-in-Lending disclosure, settlement statement or HUD-provide a copy of the same to Plaintiff;

f.   that each lender, servicer, creditor or owner provide a copy of any notice of cancellation rights, notice of rescission rights, or correspondence or written document discussing cancellation rights or rescission rights to Plaintiff;

g.   that each lender, servicer, creditor or owner provide a complete list of all telephone logs, communications logs, and correspondence logs, as well as all recordings, documents and digital versions of the subject matter of these logs to Plaintiff;

h.   that each lender, servicer or creditor provide documentation and proof of ownership for all parties currently holding any ownership rights under the note relating to this  Loan, and provide an opportunity to inspect the original note and trust deed under which each lender, servicer or creditor claims any rights to receive payments.

48.   The Note contains sufficient space on the note itself for endorsement whereby any assignment by allonge is ineffective pursuant to *Pribus v. Bush*, (1981) 118 Cal. App. 3d

1003.

## SUMMARY OF DEFENDANTS' WRONGFUL ACTS
## DEFENDANTS' ACT IN CONCERNT, CO-CONSPIRACY AND IN DUAL-AGENCY
## TO PERPETRATE FRAUDULENT LOAN SECURITIZATION SCHEME TO
## DEFRAUD PLAINTIFF

49.    Plaintiff is informed and believes that the loan securitization process has created a situation where no single entity has complete ownership of the Loan, or even sufficient authority to negotiate a workout or modification to the Loan. As a result the Lender, unknown investors and one or more servicers all entered into servicing agreements with an entity that cannot speak for the Loan. Servicer represented that it had the right and authority to foreclose on the Subject Property. Plaintiff is informed and believes that this representation was false because all of Servicer's and Servicer's rights regarding the Loan are derivative of rights held by unknown investors whose rights are herself dependent on the rights of the Lender and Broker who perpetrated the initiation of the Loan. Plaintiff is informed and believes that Lender and Servicer falsely, wrongfully, and further negligently or intentionally represented to Plaintiff that they had authority to service, collect, negotiate, work-out, and foreclose the Loan notwithstanding the deficiencies with the Loan.

50.    There is no evidence that Defendants ever provided Plaintiff with initial disclosures as required by state and federal law. Several attempts were made to the current loan servicer for copies of these initial disclosures, but Defendants unable or unwilling to provide them. Plus, Plaintiff does not believe, and therefore alleges upon such belief, that she ever saw either an initial good faith estimate or an initial truth in lending statement. Initial disclosures are supposed to be sent out to Plaintiff before she signed the final loan documents so she can know the terms and costs of the loan before it is too late to look for a different loan.

51.    It is a violation of Fair Lending laws for Defendants to not properly disclose the terms and true costs of the loan to Plaintiff and a separate violation for not keeping copies of the required initial disclosures for future audit. There are many non-traditional terms to this loan that Plaintiff was not aware of or was confused with these features an adjustable rate

mortgage with a two year prepayment penalty. Plaintiff was never properly informed about the complicated and dangerous features of the loan and she appears to have been intentionally deceived by Defendants into accepting this loan without knowing what it was.

52.     Plaintiff is informed and thereon believes that Loan Seller was not in fact the lender in this transaction, but was paid a fee to pose as a residential mortgage lender. In fact the source of loan funds, and thus the actual lender(s) are the underwriter (Mortgage Aggregator and Investment Banker) and the Investor(s) in Certificates secured by the Loan and other similar instruments (collectively "Lender"). These are other parties whose identities, and the nature and amount of fees they paid to the Loan Seller were withheld from Plaintiff at the closing of the Loans. Despite numerous requests they continue to be withheld from Plaintiff by the Defendants contrary to the requirements of Federal Law and applicable State Law.

53.     Dual Agency implicates all Defendants as co-conspirators in said illegal lending scheme. Unknown to Plaintiff, the Loan Seller, acting as a principal in its relationships with the independent appraiser of the property and the mortgage brokers and mortgage originators, induced the Plaintiff into transactions that did not and could not meet normal underwriting standards for a residential mortgage. The Loan Seller posed as a conventional mortgage lender, thus leading Plaintiff to reasonably believe that the Loan Seller, the Mortgage Broker, and the Loan Originator had an interest in the repayment of the Loans that Plaintiff was induced to enter into.

54.     Plaintiff is now informed and thereon believes that the Loan Seller. Loan Broker, appraisers, loan originators, title agents, escrow agents and Trustees, had no stake in the loan repayment and no interest beyond closing the transactions and collecting fees from the Lenders. This is contrary to representations and assurances from the conspiring participants in this fraudulent scheme. Plaintiff is informed and believes that the borrower's income and the appraisal were intentionally and knowingly inflated along with other loan data to justify the closing of the transactions.

55.     Plaintiff relied upon the due diligence of the apparent lender, actually the Loan

Seller in executing and accepting the closing documents. In fact, no lender was involved in the closing in the sense of an entity performing due diligence and evaluation pursuant to national standards for underwriting and evaluating risk of loaning money.

56.     Plaintiff is informed and believes that the Defendants' purpose was solely to collect fees, rebates, kickbacks and profits that were never disclosed to Plaintiff and have only recently been discovered by Plaintiff through consultation with experts in securitization of residential mortgage loans and diligent research.

57.     Plaintiff is informed and believes that Loan Seller was named as the Payee on the Loans and the lender under the Deeds allegedly securing performance of the Loans. Plaintiff is the named payer on the Loan. In accordance with State law, the Deeds and terms of security were recorded in the county records.

58.     Plaintiff is now informed and believes that notwithstanding the above, and without the knowledge of the Plaintiff at the time, the Loan Seller had entered into Assignment and Assumption Agreements with one or more parties and Pooling and Service Agreements with one or more parties including but not limited to the mortgage aggregator prior to or contemporaneously with the closing of the subject loan transaction. Under the terms of these agreements, the Loan Seller received certain payments not disclosed to Plaintiff.

## DEFENDANTS' FAILED TO DISCLOSE TO PLAINTIFFS ITS FRAUDULENT SCHEME OF PACKAGING PLAINTIFF'S LOAN IN MORTGAGE BACKED SECURITIES, CREDIT DEFAULT SWAPS UTILIZED BY PLAINTIFF TO HIDE RISK AND MAXIMIZE PROFITS CAUSING DAMAGES TO PLAINTIFF.

59.     Plaintiff is informed and believes that contrary to the documents presented before and during the closing of the loan transaction, the Loan Seller was neither the source of funding nor the lender.

60.     Thus at the time of recording, the source of funding and the lender was a different entity than the nominal mortgagee or beneficiary under the deed of trust and was neither named nor disclosed in any fashion.

61.    The security for the loan thus secured an obligation to the Loan Seller that had been paid in full by a third party, the actual lender. Said third party was acting as a institution or lender without even having been chartered or registered to do so despite regulations to the contrary from laws and rules of State or Federal authorities and/or agencies.

62.    Plaintiff is informed and believes that the Loan and Deed were ostensibly allocated into a new entity (Special Purpose Vehicle "SPV") formed for the express purpose of holding the pooled assets under certain terms.

63.    The terms included the allocation of payments from one note to pay any deficiency in payment of another note in unrelated loan transactions contrary to the terms of each such note which required payments to be allocated to the principal, interest, escrow and fees associated with only that specific loan transaction.

64.    Whether such deficiency was caused by the difference between the higher general terms of description of the note or the lower actual payment requirements from the borrower is not known.

65.    Plaintiff is informed and believes that insurance was purchased from proceeds of these transactions, credit default swaps were purchased from proceeds of these transactions, the investors' investments were oversold to create a reserve pool from which the SPV could pay deficiencies in payments, and the SPV created cross-collateralization agreements and overcollateralization of the pool assets to assure payments to the investors, thus creating co-obligors on the payment stream due from the Plaintiff on the Loans.

66.    The pool assets, including the Loans and Deeds were pledged completely to the owners of the asset-backed securities. All the certificates were then transferred to Sellers who in turn sold the certificates in varying denominations, each of which had slightly different terms depending upon which segment of the pools (tranches) secured the investments.

67.    If there is a holder in due course of the Plaintiff's Loans and Deeds arising from the subject loan transactions it is the investors who purchased said securities (certificates). Some of said securities are held by the original purchaser thereof, others were sold at weekly auction markets, others were paid by re-sales of property that was secured, others were paid

from prepayments, others were paid by sale at full or partial price to the investment bank that originated the entire transaction, some of which might be held by the Federal Reserve as nonrecourse collateral, and others might have been paid by one or more of the insurance, credit default swaps, cross guarantees or cross collateralization of the segment of the pool that secured the relevant investor who owned certificates backed by a pool of assets that included the subject loan transaction.

## DEFENDANTS' FRAUDULENT MORTGAGE BACKED SECURITIES VIOLATED SECURITIES EXCHANGE COMMISSION REGULATIONS

68.     Moreover, Plaintiff is informed and believes and thereon alleges that the unlawfully related, interconnected, and controlled entities of the business combinations violated regulations promulgated by the Securities Exchange Commission ("SEC"), generally accepted accounting principles ("GAAP") and accounting standards ("FAS") such that the purported transfers of the Loans and Deeds were not "true sales" or defeasances, but instead had, by agreement of the business combinations, Defendants included, indicia of retained control, including repurchase rights and obligations, that provided incentives to them to preclude and avoid Plaintiff from discovering the true beneficial holders of her instruments, and thus providing Plaintiff a true, meaningful opportunity to avoid loss to herself, and correlatively, an opportunity for the true note holders to mitigate their own loss of investments by a mutually acceptable modification of the Loans. Plaintiff is informed and believes and thereon alleges that as a consequence of the wrong acts and conduct of Defendants herein alleged, both Plaintiff and the true note holders have been irreparably harmed and damaged.

## THE FEDERAL GOVERNMENT'S FORECLOSURE PREVENTION AND LOAN MODIFICATION PROGRAM

69.     The United States Congress passed the Emergency Economic Stabilization Act of 2008 (the" Act") on October 3, 2008.  (12 U.S.C. § 5211 et. seq.) The purpose of the Act was to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority was used, in part, to "preserve homeownership." (Act, 2(1)(B)). In addition to allocating $700 billion to the United States

Department of the Treasury, the Act also specifically granted the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program or TARP ("TARP"). (12 U.S.C. §§ 5211, 5225.)

70.     In exercising its authority to administer TARP, Congress mandated that the Secretary of the Treasury "shall" take into consideration the "need to help families keep their homes and to stabilize communities." (12 U.S.C. § 5213(3).) To that end, Congress created two specific sections within Title I of the Act related to homeowners. Section 109 of the Act is entitled "Foreclosure Mitigation Efforts," and specifically states that the Secretary "shall" implement a plan to "maximize assistance for homeowners." (12 U.S.C. § 5219(a)). These efforts are to be coordinated with the federal agencies including the Federal Housing Finance Agency, which is the conservator for Fannie Mae and Freddie Mac. The Act further requires the Secretary of the Treasury to consent to any reasonable loan modification offer:

> "[T]he Secretary *shall* consent, where appropriate, and considering net present value to the taxpayer, to reasonable requests for loss mitigation measures, including term extensions, rate reduction, principal write downs, increases in the proportion of loans within a trust or other structure allowed to be modified or removal of other limitations on modifications."

(emphasis added; 12 U.S.C. § 5219(c)).

71.     Similarly, Section of the Act requires the Federal Housing Finance Agency, as conservator for Fannie Mae and Freddie Mac, to create and implement a plan to prevent foreclosures. Specifically, the Act states:

> [T]he Federal property manager [defined, in part, as the Federal Housing Finance Agency] shall implement a plan that seeks to maximize assistance for homeowners and ... minimize foreclosures.

(U.S.C. § 5220(b)(1).

72.     The statutory tools to be used by Fannie Mae and Freddie Mac include reducing

interest rates and reducing the principal balance of mortgage loans.

## MAKING HOME AFFORDABLE PROGRAM AND HAMP

73.    Pursuant to its legal authority, as granted to it by Congress, both the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program on February 18, 2009. The Making Home Affordable program consists of two subprograms. The first subprogram relates to the creation of refinancing products for individuals with minimal or negative equity in their home, which eventually was entitled the Home Affordable Refinance Program or HARP. The second subprogram relates to the creation and implementation of a uniform loan modification protocol, which eventually was entitled the Home Affordable Modification Program or HAMP.

74.    The scope of HAMP is broad. The Treasury Department estimates that approximately 85 percent of homeowners in the United States are eligible for the program. Homeowners who meet the government's criteria and standards for the program are entitled to a loan modification pursuant to the terms of HAMP. A mortgage loan servicer implementing HAMP does not have discretion to deny a homeowner access to the HAMP program if the homeowner satisfies the government's criteria for the program.

75.    HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $50 billion of its TARP money to fund the HARP refinance and HAMP modification programs and offered an additional $25 billion of non-TARP funds, totaling $75 billion.

76.    By statute, the Treasury Department, Fannie Mae and Freddie Mac must jointly develop the policies and procedures for the Making Home Affordable Program, including HAMP.

77.    Fannie Mae is the fiscal agent of the federal government for HAMP. Freddie Mac is responsible for compliance, that is, auditing mortgage loan servicers for compliance with program rules and protocols. HAMP applies to any mortgage loan owned by Fannie Mae and Freddie Mac, as well as any loans owned by companies that accepted the TARP money or who volunteered to participate in the program.

## "UNCLEAN HANDS" WHICH PRECLUDED FORECLOSURE AND TRANSLATES INTO PLAINTIFF'S NOT BEING IN DEFAULT UNDER THE MORTGAGE WHICH WOULD MEAN THERE WOULD BE NO GROUNDS FOR THE FORECLOSURE AND THE FORECLOSURE SHOULD NOT BE PERMITTED

78.     A number of courts have relied upon the "unclean hands" doctrine to prevent foreclosure, despite a Servicer's legal right to foreclose. (*LaSalle v. Bank Nat'l Ass'n v. Bardales*, 2009 WL 1312509 (Conn. Super. Ct. Apr. 14, 2009); *New Alliance Bank V. Win Holdings Int'l, Inc.*, 2008 WL 732036 (Conn. Super. Ct. Feb. 27, 2008); *Monetary Funding Group, Inc. v. Pluchino*, 2003 WL 22133826 (Conn. Super. Ct. Sept. 3, 2003); *Marin v. Seven of Five Ltd.*, 921 So. 2d (Fla. Dist. Ct. App. 2006); *Prudential Ins. Co. of Am. V. Jackson*, 270 N.J. Super. 510, 637 A.2d 573 (N.J. Super. Ct. App. Div. 1994); *M&T Mortg. Corp. V. Foy*, 858 N.Y.S.2d 567 (N.Y. Sup. Ct. 2008).

79.     Courts often recognize the harshness of forfeiture in real estate contracts and, under the maxim "equity abhors a forfeiture," have in various jurisdictions refused in equity to uphold strict forfeiture provisions in contracts. (See, e.g. *Warner v. Haught, Inc.*, 329 S.E.2d 88 (W. Va. 1985); *Bailey v. Savage*, 236 S.E.2d 203 (W. Va. 1977). A court may be particularly attentive to this issue when the forfeiture seems disproportionate or oppressive and unconscionable under the circumstances.

80.     As the HAMP loan modification analysis has the clear potential to obviate the need for forfeiture and lead to more balanced results for both the investor and Plaintiff, a court should be inclined to accept a Servicer's failure to properly evaluate Plaintiff for a loan modification as a valid defense to foreclosure.

## LOAN MODIFICATION VIOLATES HAMP'S INDUSTRY STANDARD REQUIRING LOAN MODIFICATION ANALYSIS PRIOR TO FORECLOSURE, AS A MATTER OF LAW

81.     Industry standards generally provide a guiding principle for determination of whether a particular industry practices is valid, even when a law has not specifically delineated the practice (*Ladco Properties XVII v. Jefferson-Pilot Life Ins. Co.*, 531 F.3d 718 (8th Cir.

2008); *Federal Deposit Ins. Corp. v. Transworld Mortgage*, 120 F.3d 266 (5th Cir. 1997); *Puentes v. Servicer Home Mortg. Inc.*, 160 Cal. Ap. 4th 638, 72 Cal. Rptr. 3d903 (2008); *Bank of New York v. Nat'l Funding*, 2005 WL 527749 (Conn. Super. Ct. Jan. 21, 2005).

82.    A Servicer's failure to comply with an industry standard set forth in federal law establishes a defense to foreclosure. Indeed, Congress has specifically articulated that the HAMP loan modification analysis is the standard of the residential mortgage servicing industry. (Helping Families Save Their Homes Act of 2009, Pub. L. No. 111-22 (2009). Section 129 provides: "Standard Industry Practice – the qualified loss mitigation plan guidelines issued by the Secretary of the Treasury under the HAMP guidelines issued by the Secretary of the Treasury under the Emergency Economic Stabilization Act of 2008 shall constitute standard industry practice for purposes of all Federal and State laws."

83.    Defendants never advised Plaintiff that "the pooling and servicing agreement other similar servicing contract governing Defendant servicing of a mortgage loan prohibits [Defendants] from performing the Services for [Plaintiff's loan])". Defendants never advised Plaintiff that they had used "reasonable efforts to remove all prohibitions or impediments to [their] authority, and use[d] reasonable efforts to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate [the] modification of [Plaintiff's] loan under any Loan Modification Program."

84.    The Defendants failure to comply with Civil Code §2924 greatly prejudiced the Plaintiff's rights of un-encumbering her property or refinancing her property due to Defendants' failure to properly notice Plaintiff of the foreclosure pending on her property.

85.    As a result of these wrongful acts and omissions, Plaintiff was not properly notified of the pending foreclosure process that was instituted in violation of Civil Code §§ 2924(b) and 2923.5.

86.    As a result of the statutory violations, the sale of the Subject Property was wrongful and should be rescinded.

87.      Also, as a result of the statutory violations, the Trustee's Deed Upon Sale should be rescinded.

88.      As a result of these wrongful acts and omissions, Plaintiff has been precluded from properly curing any default in her mortgage and also from all the rights and benefits that go along with a person's ability to own and reside in a home.

89.      As a result of these wrongful acts and omissions, Plaintiff has been precluded from benefiting from the rights granted by Civil Code §§ 2924(b) and, 2923.5 and modifying her current loan to a principal amount and an interest rate which she could not only afford, but would have allowed her to stay in her home. Notwithstanding their violations, Defendant's willful and malicious conduct caused the foreclosure of Plaintiff's residence. Notwithstanding their violations, Defendants callously seek to foreclose and evict Plaintiff from her home.

## FIRST CAUSE OF ACTION

### VIOLATION OF DUE PROCESS - FAILURE TO PROMULGATE RULES REQUIRING A MEANINGFUL OPPORTUNITY TO BE HEARD, REASONED DECISION MAKING AND NOTICE OF DENIAL

### (AGAINST ALL DEFENDANTS)

90.      Plaintiff re-alleges and incorporates by reference the above paragraphs as though set forth fully herein.

91.      The Fifth Amendment to the United State Constitution commands the federal government: "No person shall. .. be deprived of life, liberty, or property, without due process of law."

92.      Procedural due process further requires an opportunity to correct mistakes, to review or appeal an adverse decision in a fair and impartial manner, as well as notice of such an opportunity.

93.      Government entities administering entitlement programs such as Defendants are constitutionally obligated to provide program regulations, guidelines, or rules which comport with procedural due process.

94.     Pursuant to the Fifth Amendment, Defendants are required to have promulgated regulations, guidelines or rules that require servicers of Defendants' mortgage loans or participants in the HAMP providing for a meaningful opportunity to be heard within a process of reasoned decision making; to provide a written notice stating the reason for denial and showing proper application of the "loss mitigation waterfall" and net present value determination, as well as the procedure to appeal an adverse decision. Defendants failed to fulfill these requirements.

95.     Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

**SECOND CAUSE OF ACTION**

**VIOLATION OF DUE PROCESS**

**FAILURE TO PROMULGATE RULES REQUIRING**

**A RIGHT TO REVIEW OR APPEAL TO AN IMPARTIAL ARBITER**

**(AGAINST ALL DEFENDANTS)**

96.     Plaintiff re-alleges and incorporates by reference the above paragraphs as though set forth fully herein.

97.     The Fifth Amendment to the United State Constitution commands the federal government: *"NO* person shall... be deprived of life, liberty, or property, without due process of law ... " HAMP is an entitlement program such that its benefits cannot be administered arbitrarily and without procedural due process.

98.     Procedural due process requires meaningful notice of the specific reason why a person has been denied, and, in order to be meaningful, procedural due process further requires an opportunity to correct mistakes or appeal an adverse decision as well notice of such an opportunity. Government entities administering entitlement programs such as Defendants are constitutionally obligated to provide program regulations, guidelines, or rules which comport with procedural due process.

99.     Pursuant to the Fifth Amendment, Defendants are required to have promulgated regulations that create a uniform process to provide homeowners an unbiased and uniform

process to evaluate and reverse adverse decisions related to HAMP and undo adverse actions, and provide a written decision related to the appeal. Defendants failed to fulfill these requirements.

100. Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

## THIRD CAUSE OF ACTION

## VIOLATIONS OF FAIR CREDIT REPORTING ACT

## (AGAINST ALL DEFENDANTS)

101. Plaintiff re-alleges and incorporates by reference the above paragraphs as though set forth fully herein.

102. At all times material, Defendants qualified as providers of information to the Credit Reporting Agencies, including but not limited to Experian, Equifax, and TransUnion, under the Federal Fair Credit Reporting Act.

103. Defendants wrongfully, improperly, and illegally reported negative information as to the Plaintiff to one or more Credit Reporting Agencies, resulting in Plaintiff having negative information on her credit reports and the lowering of her FICO score.

104. The negative information included but was not limited to an excessive amount of debt into which Plaintiff was tricked and deceived into accepting.

105. Pursuant to 15 USC §1681(s)(2)(b), Plaintiff is entitled to maintain a private cause of action against Defendants for an award of damages in an amount to be proven at the time of trial for all violations of the Fair Credit Reporting Act which caused actual damages to Plaintiff, including emotional distress and humiliation.

106. Plaintiff is entitled to recover damages from Defendants for negligent noncompliance with the Fair Credit Reporting Act pursuant to 15 USC §1681(o).

107. Plaintiff is also entitled to an award of punitive damages against Defendants for their willful noncompliance with the Fair Credit Reporting Act pursuant to 15 USC § 1681(n)(a)(2) in an amount to be proven at time of trial.

108.    Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

## FOURTH CAUSE OF ACTION

## VIOLATION OF CIVIL CODE § 2923.5

## (AGAINST ALL DEFENDANTS)

109.    Plaintiff re-alleges and incorporates by reference the above paragraphs as though set forth fully herein.

110.    California Civil Code §2923.5 requires in relevant portion that, 30 days prior to filing a notice of default, "[a] mortgagee, beneficiary, or authorized agent shall contact the borrower in person or by telephone in order to assess the borrower's situation and explore options for the borrower to avoid foreclosure." Cal. Civ. Code §2923.5(a)(2). The statute further requires the lender to "advise the borrower that she or she has the right to request a subsequent meeting and, if requested... schedule the meeting to occur within 14 days." Cal. Civ. Code §2923.5(a)(2).

111.    In connection with the mortgage loan to Plaintiff, the Defendants violated Code § 2923.5 by failing to contact Plaintiff to explore options and alternatives in modifying Plaintiffs loans, in good faith, with Plaintiff in order to avoid foreclosure of Plaintiff's home. Defendants further violated Cal. Civ. Code §2923.5(a)(2) by failing to advise the Plaintiff that she has the right to a subsequent meeting within 14 days. Plaintiff is informed and believes and thereon alleges that Defendants further violated the general intent of the statute by falsely reciting in either or both of the Notices of Defaults and/or Notices of Sale that substantive procedures under California foreclosure statutes were complied with in these regards. Furthermore, Defendants would not come and meet with Plaintiff. Plaintiff is informed and believes and thereon alleges that the wrongful motive of the Loan Seller in so doing was to recoup advances on loan payments, foreclose upon Plaintiff and book a loss on the collateral in order to reap insurance proceeds as alleged herein and to avoid liability for their repurchase obligations, and in so doing inflict the harm and damages to both Plaintiff and true note holders herein alleged.

112.    The California Legislature made certain explicit findings and enacted them into the relevant statute at issue in this case: "The Legislature finds and declares... that a servicer acts in the best interests of all parties if it agrees to or implements a loan modification or workout plan for which both of the following apply: (1) the loan is in payment default, or payment default is reasonably foreseeable. (2) Anticipated recovery under the loan modification or workout plan exceeds the anticipated recovery through foreclosure on a net present value basis." Cal. Civ. Code §2923.6.

113.    Plaintiff is capable of making payments on a modified loan that, at net present value, exceeds the amount available to Defendants in a foreclosure sale. Instead, Defendants' breach of the statute induced Plaintiff to enter a course of action which was contrary to the Plaintiff's interest, contrary to the interests of the people of the State of California and the intent of the Legislature, and contrary to Plaintiffs preservation of their home.

114.    Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

### FIFTH CAUSE OF ACTION

### DEFENDANTS LACK STANDING IN ATTEMPTING TO CONDUCT A NON-JUDICIAL FORECLOSURE IN VIOLATION OF *CALIFORNIA CIVIL CODE § 2932.5*

### (AGAINST ALL DEFENDANTS)

115.    Plaintiff re-alleges and incorporates by reference the above paragraphs as though set forth fully herein.

116.    Trustee does not have standing to enforce a non-judicial foreclosure.

117.    In California, *California Civil Code § 2932.5* governs the power of sale under an assigned mortgage, and provides that the power of sale can only vest in a person entitled to money payments:

118.   "Where a power to sell real property is given to a mortgagee, or other encumbrancer, in an instrument intended to secure the payment of money, **the power is part of the security** and vests in any person who **by assignment becomes entitled to payment** of the money secured by the instrument. The power of sale may be exercised by the assignee if the assignment is duly acknowledged and recorded."(emphasis added)

119.   In *Carpenter v. Longan*, (1872) 83 U.S. 271, 274, the United States Supreme Court held that the note and the mortgage are inseparable; the former as essential, the latter as an incident.  An assignment of the note carries the mortgage with it, while the assignment of the latter alone is a nullity.

120.   The United States Supreme Court also states that "[t[he fallacy which lies in overlooking this distinction has misled many able minds, and is the source of all the confusion which exists. The mortgage can have no separate existence." *Id.* at 275.

121.   In California, the substantive law that governs negotiable instruments, such as promissory notes, is CCC Article 3. The only person entitled to enforce the note is the holder of the note. *In re: Kang Jin Hwang*, (2008) 393 B.R. 701, 707.

122.   Since 1872, this has long been the principle in all the United States, when a note secured by a mortgage is transferred, transfer of the note carries with it the security, without any formal assignment or delivery or even mention of the latter. *Id.* at 708.

123.   It has also been noted that "[a] security interest cannot exist, much less be transferred, independent from the obligation which it secures." *In re Leisure Time Sports, Inc.*, (1996) 194 B.R. 859, 861.  As such there can be no assignment of the security interest independent of the assignment of the obligation.

124.   "This is not a mere technical legal requirement: To allow the assignee of a

security interest to enforce the security agreement would expose the obligor to a double liability since a holder in due course of the promissory note clearly is entitled to recover from the obligor." *Id.*

125. Trustee was a stranger to this transaction, and had no authority to record a Notice of Default against Plaintiff's home.

126. Plaintiff executed a Note and a Deed of Trust to alleged Lender.

127. Lender has apparently sold the Note to an unidentified "Investor."

128. Lender has refused to identify the current owner of the Note.

129. Trustee was not listed anywhere in the Deed of Trust or Note.

130. Lender had never assigned its rights under the Note to Trustee

131. At the time Trustee recorded the Notice of Default, they did not have standing to initiate the foreclosure proceedings.

132. The Substitution of Trustee that was recorded did not comply with *California Civil Code § 2934(a)(2)*

133. The power of sale cannot be exercised by Trustee since there was never an acknowledged and recorded assignment pursuant to *California Civil Code § 2932.5.*

134. Lender has only provided a copy of the initial Note illustrating that they were at one time the owners of the Note, but are no longer owners of the Note, but rather that they are merely servicing the loan on behalf of an unidentified investor.

135. Lender has failed to provide evidence that a proper assignment of the Note to Trustee was made and recorded pursuant to *California Civil Code § 2932.5.*

136. Since the Defendants did not comply with *California Civil Code §2932.5*, the Notice of Default provisions of *California Civil Code § 2924* and Notice of Sale provisions of

*California Civil Code §2924(f)* were likewise never complied with.

137.    Trustee never complied with the Notice of Default provisions of *California Civil Code §2924* and Notice of Sale provisions of *California Civil Code §2924(f)*.

138.    Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

## SIXTH CAUSE OF ACTION

## DEFENDANTS LACK STANDING IN ATTEMPTING TO CONDUCT A NON-JUDICIAL FORECLOSURE PURSUANT TO *CALIFORNIA COMMERCIAL CODE § 3301*

### (AGAINST ALL DEFENDANTS)

139.    Plaintiff re-alleges and incorporates by reference the above paragraphs as though set forth fully herein.

140.    A promissory note is personal property and the deed of trust securing a note is a mere incident of the debt it secures, with no separable ascertainable market value. *California Civil Code §§ 657, 663. Kirby v. Palos Verdes Escrow Co.,* (1986) 183 Cal. App. 3d 57, 62.

141.    Any transfers of the notice and mortgage fundamentally flow back to the Note:

142.    "The assignment of a mortgage without a transfer of the indebtedness confers no right, since debt and security are inseparable and the mortgage alone is not a subject of transfer" *Hyde v. Mangan* (1891) 88 Cal 319; *Johnson v. Razy* (1919) 181 Cal 342; *Bowman v. Sears* (1923) 63 Cal App 235; *Treat v. Burns* (1932) 216 Cal. 216,

143.    "A mortgagee's purported assignment of the mortgage without an assignment of the debt which is secured is a legal nullity." *Kelley V. Upshaw* (1952) 39 Cal. 2d 179.

144.    "A trust deed has no assignable quality independent of the debt; it may not be

assigned or transferred apart from the debt; and an attempt to assign the trust deed without a transfer of the debt is without effect." *Domarad v. Fisher & Burke, Inc.* (1969) 270 Cal.App.2d 543.

145.   The Note is a negotiable instrument.

146.   Transferring a Deed of Trust, by itself, does not allow enforcement of the instrument unless the Promissory Note is properly negotiated.

147.   Where an instrument has been transferred, enforceability is determined based upon possession.

148.   *California Commercial Code § 3301* limits a negotiable instrument's enforcement to the following:

149.   "Person entitled to enforce" an Instrument means (a) the holder of the instrument, (b) a non-holder in possession of the instrument who has the rights of a holder, or (c) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to Section 3309 or subdivision (d) of Section 3418. A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument."

150.   Lender has only provided a copy of the Note and has failed to provide evidence that they are in possession of the "Instrument" (Original Note).

151.   None of the Defendants have demonstrated that they are non-holders in possession of the instrument who had rights of the holder.

152.   None of the Defendants were entitled to enforce the instrument pursuant to California Commercial Code § 3309 or subdivision (d) of Section 3418.

153.   Defendants had no enforceable rights under *California Commercial Code*

*3301(a)* to enforce the negotiable instrument.

154.    Since there was no right to enforce the negotiable instrument, the Notice of Default provisions of *California Civil Code § 2924* and Notice of Sale provisions of *California Civil Code § 2924f* were likewise never complied with, and there was no subsequent incidental right to enforce any deed of trust and proceed with a non-judicial foreclosure.

155.    As a direct result of Defendants' acts, Plaintiff has incurred actual damages consisting of mental and emotional distress, nervousness, grief, embarrassment, loss of sleep, anxiety, worry, mortification, shock, humiliation, indignity, pain and suffering, and other injuries.

156.    Plaintiff incurred out of pocket monetary damages.

157.    Plaintiff continues to incur monetary damages.

158.    Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

**SEVENTH CAUSE OF ACTION**

**DECLARATORY RELIEF**

**(AGAINST ALL DEFENDANTS)**

159.    Plaintiff re-alleges and incorporates by reference the above paragraphs as though set forth fully herein.

160.    Defendants contend that they have the right to foreclose on Plaintiff's home, including without limitation, proceeding with a Trustee 's Sale relative to the property.

161.    Defendants did not have standing or any enforceable right to enforce the Note and any incidental rights to collateral so as to foreclose on Plaintiff's home, including without

limitation, proceeding with a Trustee's Sale relative to that property.

162.    An actual controversy presently exists between Plaintiff and Defendants as to the existence of Defendants' ability or right to foreclose on Plaintiff's home.

163.    A judicial decision is necessary and appropriate at this time so that Plaintiff and Defendants may ascertain their respective rights relative to Plaintiff's home.

164.    Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

## **EIGHTH CAUSE OF ACTION**

## **VIOLATION OF RESPA 12 U.S.C. § 2605**

### **(AGAINST ALL DEFENDANTS)**

165.    Plaintiff incorporates by this reference each and every allegation contained in all foregoing paragraphs, as though set forth in full herein.

166.    Defendants Lender, Servicer and other Defendants failed to adequately respond to Plaintiff requests for information regarding the Loan and for an opportunity to work out the Loan.

167.    Defendants Lender, Servicer and other Defendants failed to adequately respond to Plaintiff Qualified Written Requests in violation of RESPA.

168.    Defendants Lender, their predecessors and other Defendants were required to give Plaintiff notice of transfer and the required sixty (60) days after the transfer period before assessing a late fee pursuant to 2605(d).

169.    Defendants Lender, Servicer and other Defendants improperly imposed a late fee on Plaintiff within sixty (60) days of the Loan transfer.

170.    Plaintiff is informed and believes that Defendants Lender, Broker and other Defendants violated RESPA at the origination of the Loan in various ways including but not

limited to the following:

a.      Various disclosures and notices, especially with respect to rescission rights, were not provided to Plaintiff at the time the Loan was funded.

171.    As a proximate result of the negligent conduct of Defendants and their failures as herein alleged, Plaintiff sustained damages, including monetary loss, medical expenses, emotional distress, loss of employment, loss of credit, loss of opportunities, and other damages to be determined at trial. As a proximate result of Defendants' breach of duty and all other actions as alleged herein, Plaintiff has suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and mental and physical pain and anguish, all to Plaintiff damage in an amount to be established at trial. Plaintiff seeks to recover all possible damages Plaintiff is entitled to recover pursuant to RESPA, including statutory and punitive damages if possible.

172.    Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

## NINTH CAUSE OF ACTION

### VIOLATION OF TRUTH-IN-LENDING ACT 15 U.S.C. § 1601 et seq.
### (AGAINST ALL DEFENDANTS)

173.    Plaintiff incorporates by this reference each and every allegation contained in all foregoing paragraphs, as though set forth in full herein.

174.    All Defendants have fraudulently concealed facts upon which the existence of Plaintiff' claims is based, and as such, the statute of limitations is equitably tolled as to this Cause of Action.

175.    This consumer credit transaction was subject to Plaintiff right of rescission as described by 15 U.S.C. § 1635(a) and Regulation Z § 226.23 (12 C.F.R. § 226.23).

176.    More particularly, the same Defendants violated 15 U.S.C. § 1635(a) and Regulation Z § 226.23(b) with regards to the purported Notice of Right to Cancel. As a consequence of this action, the Notice of Right to Cancel documentation furnished to Plaintiff to failed to:

a.    Correctly identify the transaction;

b.    Clearly and conspicuously disclose Plaintiff right to rescind the transaction three days after delivery of all required disclosures;

c.    Clearly and conspicuously disclose how to exercise the right to rescind the transaction, with a form for that purpose;

d.    Clearly and conspicuously disclose the effects of rescission; and

e.    Clearly and conspicuously disclose the date the rescission period expired.

177.    Furthermore, Plaintiff is informed and believes that Broker, Lender and Servicer violated TILA at the time of origination because, among other things:

a.    The interest rate on the note and the Truth-in-Lending disclosure was deceptively presented and not consistent;

b.    The APR was not correctly calculated; and

c.    The required payments to the Originating Lender and Broker were not fully disclosed.

178.    Plaintiff is informed and believes that Defendants' violation of the provisions of law rendered the credit transaction null and void, invalidates Defendants' claimed interest in the Subject Property, and entitles Plaintiff to damages as proven at trial.

179.    Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

### TENTH CAUSE OF ACTION

### VIOLATION OF FAIR DEBT COLLECTION PRACTICE ACT 15 U.S.C. 1692

### (AGAINST ALL DEFENDANTS)

180.    Plaintiff incorporates by this reference each and every allegation contained in all foregoing paragraphs, as though set forth in full herein.

181.    After a debt collector becomes aware that a borrower is represented by an attorney with regard to a subject debt, the debt collector must not communicate with any person other than the attorney, including the borrower.

182.    Plaintiff was represented by and through his attorney of record with respect to monies allegedly owed on the Loan.

183.    Defendants were aware that Plaintiff was represented. Plaintiff sent several letters to Defendants, via counsel, which put Defendants on notice that Plaintiff had retained an attorney with respect to the Loan.

184.    Specifically, correspondence and Qualified Written Requests were sent to Servicer, clearly stating that Plaintiff had retained its counsel with respect to the Loan.

185.    Despite having received notification that Plaintiff was represented by legal counsel, Defendants persisted in making phone calls and/or sending correspondences to Plaintiff.

186.    Plaintiff, in an effort to stop the harassment, sent via counsel additional letters to Servicer and Servicer informing them that direct communication with Plaintiff violates state and federal law.

187.    Plaintiff sent letters via counsel to Servicer informing Servicer that its continued and repetitive efforts to contact Plaintiff are unlawful.

188.   Despite receiving numerous notices as described above, Plaintiff continued to receive phone calls and/or written correspondences which attempted to collect monies from Plaintiff allegedly owed on the Loan.

189.   Plaintiff is informed and believes that these acts violated the Federal Fair Debt Collection Practices Act.

190.   Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

## ELEVENTH CAUSE OF ACTION

## ROSENTHAL FAIR DEBT COLLECTIONS PRACTICES ACT CALIFORNIA CIVIL CODE § 1788 et seq.

### (AGAINST ALL DEFENDANTS)

191.   Plaintiff incorporates by this reference each and every allegation contained in all foregoing paragraphs, as though set forth in full herein.

192.   Plaintiff is informed and believes that the wrongful acts alleged above are violations of the Fair Debt Collection Practices act also violate the Rosenthal Act.

193.   Plaintiff is informed and believes that these acts violated the Rosenthal Act.

194.   As a proximate result of the breach, Plaintiff made payments to Defendants under pressure from a threatened foreclosure but Defendants never provided the promised benefits to Plaintiff.

195.   Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

## TWELFTH CAUSE OF ACTION

## UNFAIR COMPETITION UNDER BUSINESS & PROFESSIONS CODE §

## 17200

### (AGAINST ALL DEFENDANTS)

196.    Plaintiff incorporates by this reference each and every allegation set forth in all foregoing paragraphs, as though set forth in full herein.

197.    Defendants have engaged in business practices that are unlawful, unfair and fraudulent.

198.    Defendants' business practices are unlawful as the activities alleged herein, i.e. those described in the foregoing causes of action, are forbidden by law.

199.    Defendants' business practices are unfair because they offend public policy, are immoral, unethical, oppressive, and substantially injurious to consumers. Defendants, with little to no regard to Plaintiff's financial condition, brokered, executed and serviced the Loan. Simultaneously, Plaintiff was unaware that Loan was unaffordable to Plaintiff given the oral representations to the contrary made by Defendants, as well as the volume, complexity and incomprehensible nature of loan-related documents provided by Defendants to Plaintiff.

200.    Further, Defendants' business practices can be classified as unfair on the additional grounds that the damage accruing to Plaintiff as a result of the defective Loan significantly outweighs the reasons, justifications and motives of Defendants in brokering, executing and servicing the Loan. Due to the Loan, Plaintiff is burdened with a higher interest rate, a mortgage that did not pay off the debts (as Defendants promised it would) and the period of Plaintiff mortgage is longer than it should be; in return, Defendants and each of them have unfairly and unlawfully received commissions, fees and payments from Plaintiff.

201.    This cause of action is also based upon Defendants' violations of Civil Code § 2923.5, Business and Professions Code § 1788, 15 USC 1692, 15 U.S.C. 1601, 12 U.S.C. §

2605, Civil Code § 2923.5, 15 USC §1681(s)(2)(b), Constitutional Due Process, among other violations.

202.    This cause of action is based upon Defendants' fraud in stating under penalty of perjury to the State of California on its Exemption Affidavit pursuant to § 2923.53 that it has a compliant loan modification program offered to those who qualify. When in fact, Defendants do not have a compliant loan modification program. Plaintiff requests for the remedy of injunctive relief, requesting that the Court order Defendants to comply with its Exemption Affidavit.

203.    Finally, Defendants business practices were fraudulent because their activities were deceptive to the public. Among other things, Defendants represented to Plaintiff that very favorable loans, loan terms and interest rates were available, when in fact, they were not.

204.    Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

### THIRTEENTH CAUSE OF ACTION

#### NEGLIGENT MISREPRESENTATION
Count 1

(Against Defendants Lender and Broker)

205.    Lender and Broker made material misrepresentations to Plaintiff which include, but are not limited to, those listed above.

Count 2

(Against Defendants Servicer and Servicer)

206.    Servicer and/or Servicer aided, abetted and were in a contractual relationship with Lender and other investors as to downstream transactions regarding transfer and servicing of the Loan.

Count 3

(Against Defendants Servicer and DOES)

207.    After the Loan, which were deficient at the origination stage, were transferred to Servicer and Servicer and/or Servicer threatened and/or initiated foreclosure proceedings against Plaintiff. Servicer and/or Servicer made a misrepresentation of material fact by representing to Plaintiff that they had the authority and right to foreclose on the Loan, when in fact, they did not.

208.    Plaintiff received a Notice of Trustee 's Sale from Trustee . Servicer and/or Servicer authorized Trustee  Corps to proceed with a Trustee 's Sale on the Subject Property. By authorizing the Notice of Trustee 's Sale, Servicer and/or Servicer falsely and negligently represented to Plaintiff that they had the authority to foreclose on the Loan.

209.    Plaintiff is informed and believes that the representations of Servicer and/or Servicer were false since Servicer and/or Servicer knew or should have known that they did not have the authority or right to foreclose on the Loan that were deficient at the origination stage.

210.    If any of Defendants' misrepresentations made herein were not intentional, said misrepresentations were negligent. When Defendants made the representations alleged herein, they had no reasonable ground for believing them to be true.

211.    Defendants made these representations with the intention of inducing Plaintiff to act in reliance on these representations in the manner hereafter alleged, or with the expectation that Plaintiff would so act.

212.    Plaintiff, unaware of the complexities and/or defects involved in the subsequent transactions between Defendants that occurred after Plaintiff entered into the

Loan, justifiably relied on Servicer's and/or Servicer's representations that they had the authority to foreclose on the Loan.

213.    As a proximate result of the negligent misrepresentations of Defendants as herein alleged, Plaintiff sustained damages, including monetary loss, medical expenses, emotional distress, loss of employment, loss of credit, loss of opportunities, attorney fees and costs, and other damages to be determined at trial. As a proximate result of Defendants' breach of duty and all other actions as alleged herein, Plaintiff has suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and mental and physical pain and anguish, all to Plaintiff damage in an amount to be established at trial.

214.    Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

## FOURTEENTH CAUSE OF ACTION

### FRAUD

215.    Plaintiff incorporates by this reference each and every allegation contained in all foregoing paragraphs, as though set forth in full herein.

216.    Plaintiff is informed and believes that Broker, Lender, Servicer and other Defendants made various false misrepresentations to Plaintiff regarding the Loan and induced Plaintiff to enter into the Loan. Servicer and Servicer assumed the responsibilities and duties owed to Plaintiff by purchasing/assuming the Loan. Broker, Lender, Servicer and other Defendants are responsible for the false misrepresentations made by Broker, Lender, Servicer, their predecessors and other Defendants herein. Defendants and each of them are successors in interest to Broker, Lender, Servicer, to each other, and other responsible parties. All Defendants and each of them acted in concert with respect to defrauding Plaintiff.

Count 1

(Against Defendants Broker and Lender)

217.    Plaintiff is informed and believes that Defendants made various misrepresentations of material fact with respect to the Loan, and induced Plaintiff to rely on said misrepresentations. 5 These misrepresentations were representations of material fact with respect to the period of the mortgages, the interest rates and other terms of the mortgages. The representations made to Plaintiff by Defendants were in fact false.

218.    Broker and its agents acting in their capacity and with the authority vested in them as agents or employees of Broker, during the origination phase of the loan transaction, made statements to Plaintiff with knowledge and ratification by Lender, which may be imputed to Lender.

219.    Plaintiff is informed and believes that all Defendants herein intended to induce Plaintiff reliance on the facts misrepresented, and variously misinformed Plaintiff regarding the terms of the Loan as alleged herein so that Plaintiff would enter into the financing agreements and so that they could cause Plaintiff to agree to the Loan. Broker, Lender, Servicer and other Defendants are successors in interest to Plaintiff Loan as alleged herein and each and all of them also intended to induce Plaintiff to accept the Loan and to continue on with the fraudulent Loan.

220.    Defendants knew or should have known that the representations made in their correspondences were in violation of RESPA. Defendants knew or should have known that the representations made by Defendants in an attempt to convince Plaintiff to take out the Loan was false.

221.    In justifiable reliance on Defendants' and each of their various misrepresentations, At the time Defendants and their predecessors herein made the promises

and representations to Plaintiff, Defendants and their predecessors herein had no intention of performing the promises.

222.   The promises were made by Defendants and their predecessors with the intent to induce Plaintiff to take out the Loan and take other actions so that Defendants and each of them could make their respective profits, commissions, yield spread premiums, sales quotas and gain other beneficial financial interests including but not limited to prepayment penalties, late payment penalties, surcharges and other fees.

223.   Plaintiff, at the time these promises were made and at the time Plaintiff took the actions herein alleged, was ignorant of Defendants' secret intentions not to perform, ignorant of Defendants' false representations stated herein, and Plaintiff could not, in the exercise of reasonable diligence, have discovered Defendants' secret intentions and false representations. In reliance on the promises of Defendants and their predecessors, Plaintiff signed various documents, ultimately ending up with the Loan.

224.   Defendants and their predecessors are reputable real estate companies doing business in California, and Plaintiff justifiably relied on their representations. Defendants and their predecessors are/were all brokers, real estate agents and other licensed professionals that worked for Defendants.

225.   Plaintiff, at the time these representations were made by Defendants and their predecessors, and at the time Plaintiff took the actions herein alleged, was ignorant of the falsity of the misrepresentations and believed them to be true. In reliance on these representations, Plaintiff was induced to take out the Loan, be burdened with fraudulent Loan, and other actions. Had Plaintiff known the actual facts, Plaintiff would not have taken such action.

226.   As a proximate result of the fraudulent conduct of Defendants as herein alleged, Plaintiff sustained damages, including monetary loss, medical expenses, emotional distress, loss of employment, loss of credit, loss of opportunities, attorney fees and costs, and other damages to be determined at trial. As a proximate result of Defendants' breach of duty and all other actions as alleged herein, Plaintiff has suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and mental and physical pain and anguish, all to Plaintiff damage in an amount to be established at trial.

227.   The aforementioned conduct of Defendants was an intentional misrepresentation, deceit, or concealment of a material fact known to Defendants with the intention on the part of Defendants of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff rights, so as to justify an award of exemplary and punitive damages, as well as attorney fees and costs.

Count 2

(Against Defendants Servicer and DOES)

228.   Defendants made various representations of material fact with respect to the Loan, and induced Plaintiff to rely on said misrepresentations.

229.   After the Loan was transferred to Servicer and Servicer, they threatened and/or initiated foreclosure proceedings against Plaintiff.

230.   Defendants Servicer and/or Servicer represented among other things that:

a.   The Loan was validly entered into and properly initiated free of unlawful or fraudulent inducements; and

b.   Defendants had proper authority to foreclose on the Loan.

231.    The representations made to Plaintiff by Defendants were in fact false.

232.    Plaintiff is informed and believes that Defendants intended to induce Plaintiff reliance on the facts misrepresented, and variously misinformed Plaintiff regarding the terms and validity of the Loan as alleged herein.

233.    Defendants knew or should have known that the representations made in their correspondences were in violation of state and federal law.

234.    In  justifiable  reliance  on  Defendants'  and  each  of  their  various misrepresentations, Plaintiff attempted to continue making payments on the Loan, made payments or partial payments, spent substantial time attempting to contact and/or negotiate with Defendants as to possible modification and workout options, and endured the emotional hardship incident the threat of losing one's home.

235.    Plaintiff, when confronted with the threat of foreclosure and at the time Plaintiff took the actions herein alleged, was ignorant of Defendants' inability to lawfully foreclose and its false representations stated herein. Plaintiff could not, in the exercise of reasonable diligence, have discovered Defendants' secret intentions and false representations. In reliance on the statements of Defendants and their predecessors, Plaintiff attempted to continue making payments on the Loan to Plaintiff detriment and Defendants' benefit.

236.    At the time Defendants and their predecessors herein made the statements and representations to Plaintiff, Defendants and their predecessors could not lawfully perform; namely, Defendants lacked the legal authority to foreclose on the Loan.

237.    The promises were made by Defendants and their predecessors with the intent to make their respective profits, commissions, sales quotas and gain other beneficial financial interests including but not limited to prepayment penalties, late payment penalties, surcharges

and other fees.

238.    Defendants and their predecessors are reputable federally recognized financial companies doing business in California, and Plaintiff justifiably relied on their representations. Defendants and their predecessors are/were all financiers that worked for Defendants.

239.    Plaintiff, at the time these representations were made by Defendants and their predecessors, and at the time Plaintiff took the actions herein alleged, was ignorant of the falsity of the misrepresentations and believed them to be true. In reliance on these representations, Plaintiff was induced to continue making payments on the Loan and initiate negotiations as to a modification on the Loan. Had Plaintiff known the actual facts, Plaintiff would not have taken such action.

240.    As a proximate result of the fraudulent conduct of Defendants as herein alleged, Plaintiff sustained damages, including monetary loss, medical expenses, emotional distress, loss of employment, loss of credit, loss of opportunities, attorney fees and costs, and other damages to be determined at trial. As a proximate result of Defendants' breach of duty and all other actions as alleged herein, Plaintiff has suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and mental and physical pain and anguish, all to Plaintiff damage in an amount to be established at trial.

241.    The aforementioned conduct of Defendants was an intentional misrepresentation, deceit, or concealment of a material fact known to Defendants with the intention on the part of Defendants of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff rights, so as to justify an award of

exemplary and punitive damages, as well as attorney fees and costs.

242.    Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

## FIFTEENTH CAUSE OF ACTION

### RESCISSION

### (AGAINST ALL DEFENDANTS)

243.    Plaintiff incorporates by this reference each and every allegation contained in all foregoing paragraphs, as though set forth in full herein.

244.    Plaintiff is entitled to rescind the Loan because the note and contract were defectively and/or fraudulently consummated in violation of applicable laws.

245.    Plaintiff is informed and believes that Defendants do not have and cannot produce an original deed and an original note relating to the Loan.

246.    Plaintiff had a continuing right to rescind the transaction until the third business day after receiving both a proper and accurate cancellation rights notice and all "material" disclosures described in the preceding paragraph, pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3), up to three years after consummation of the transaction, or extended to four years under Bus. & Prof. Code § 17,200.

247.    Based on the violations of Defendants of 15 U.S.C. § 1635, Plaintiff suffered actual damages in an amount exceeding the jurisdictional minimum of this Court and to be determined at trial in the form of prepaid interest and charges delivered to and additional damages in the form of payments, interest, fees, and charges paid by Plaintiff on the Loan. Plaintiff is entitled to additional relief under 15 U.S.C. § 1640 pursuant to 15 U.S.C. § 1635(g).

248.    As a proximate result of the conduct of Defendants as herein alleged, Plaintiff

sustained damages, including monetary loss, medical expenses, emotional distress, loss of

employment, loss of credit, loss of opportunities, attorney fees and costs, and other damages

to be determined at trial. As a proximate result of Defendants' breach of duty and all other

actions as alleged herein, Plaintiff has suffered severe emotional distress, mental anguish,

harm, humiliation, embarrassment, and mental and physical pain and anguish, all to Plaintiff

damage in an amount to be established at trial.

249.    Plaintiff has incurred damages, and prays for remedies as outlined further in

the section entitled "Prayer for Relief" enumerated below.

## SIXTEENTH CAUSE OF ACTION

### QUASI CONTRACT

### (AGAINST ALL DEFENDANTS)

250.    Plaintiff incorporates by this reference each and every allegation contained in

all foregoing paragraphs, as though set forth in full herein.

251.    Plaintiff is informed and believes that a contractual relationship exists between

Plaintiff and Servicer and/or Servicer because rights and obligations under the Note between

Plaintiff and Lender have been transferred from Lender to other currently unidentified

investors, and then to Servicer and/or Servicer. Plaintiff is informed and believes that the

current investors claiming to own the Note have entered into a contractual relationship with

Servicer and/or Servicer, conveying rights and assigning responsibilities relating to the Note

and to Plaintiff.

252.    Alternatively, if no contractual chain establishes that a contractual relationship

exists between Plaintiff and Servicer and/or Servicer, Plaintiff is informed and believes that a

quasi-contractual relationship exists between Plaintiff and Servicer and/or Servicer because,

among other things, Servicer and/or Servicer have demanded that Plaintiff make payments to them on the Note, and Servicer and/or Servicer have stated and implied that Plaintiff has a contractual obligation to pay Servicer and/or Servicer. Plaintiff has requested information regarding the terms of the arrangement between Servicer and/or Servicer and the actual owners of the Note but Servicer and/or Servicer have failed and refused to provide the information. Plaintiff will seek leave to amend this pleading when the relevant information is obtained in discovery.

253.    All Defendants received benefits from Plaintiff in the form of commissions, rebates, portions of payment streams, fees, charges or other compensation deriving from the original defective loan documents.

254.    Plaintiff is informed and believes that Servicer and/or Servicer have received fees, costs, commissions, payments, and/or other money.

255.    Plaintiff is informed and believes that Servicer and/or Servicer have received fees, costs, commissions, payments, and/or other money which each Defendant has unjustly retained.

256.    Plaintiff alleges that he paid fees, costs, commissions, payments, and/or other money to Defendants under the mistaken belief that he was under a duty to do so to his detriment, and as a result of the payment of such funds Plaintiff has suffered financially.

257.    By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants, and each of them, were unjustly enriched at the expense of Plaintiff, and Plaintiff was unjustly deprived, and is entitled to restitution.

258.    Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

### SEVENTEENTH CAUSE OF ACTION

### DETERMINATION OF VALIDITY OF LIEN

### (AGAINST ALL DEFENDANTS)

259.    Plaintiff incorporates by this reference each and every allegation contained in all foregoing paragraphs, as though set forth in full herein.

260.    Plaintiff is informed and believes and alleges that the defective documentation, false representations and/or fraud that induced Plaintiff to enter into the Loan render the security interest invalid and unenforceable.

261.    Plaintiff prays for a determination that the lien is void ab initio, and a declaratory order of the same.

262.    Defendants' claim to Subject Property is adverse to Plaintiff.

263.    Because of the wrongful acts alleged herein, Defendants, and each of them, have forfeited any and all interest in the Subject Property.

264.    Plaintiff has incurred damages, and prays for remedies as outlined further in the section entitled "Prayer for Relief" enumerated below.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them as follows:

For the first and second causes of action, Plaintiff asks this Court to:

A.    Declare Defendants conduct is a violation of procedural due process;

B.    Enjoin Defendants and their agents, nominees, attorneys, employees, representatives or anyone acting in concert or participation with Defendants from conducting a nonjudicial foreclosure sale of Plaintiff's home, or taking any further steps in proceeding with nonjudicial foreclosure of the deed of trust securing the Loan, unless or until Defendants prove they are:

1.      Promulgating regulations, guidelines, or rules that require that borrowers, such as Plaintiff, be given a reasonable opportunity to be heard concerning eligibility and qualifications for a loan modification under HAMP, and concerning the right of mortgage loan servicers, such as CHASE, to deny borrowers, such as Plaintiff, access to HAMP;  and

2.      Promulgating regulations, guidelines, or rules that require mortgage loan servicers, to notify, in writing, that a homeowner, such as Plaintiff, has been denied access to participate in HAMP and the loan modification or loss mitigation programs offered by the servicer;  and

3.      Promulgating regulations, guidelines, or rules that require mortgage loan servicers, provide a written decision stating the reason for denial, and showing proper application of the "loss mitigation waterfall;" and

4.      Promulgating regulations, guidelines, or rules that require notice of an opportunity for the homeowner, such as Plaintiff, to appeal or provide additional information to a neutral decision-maker; and

5.      Promulgating regulations, guidelines, or rules that require the disclosure of the factors and specific formula used to determine a "positive" or "negative" result by the net present value calculator;

6.      Promulgating regulations, guidelines, or rules that provide a reasonable "opportunity for a homeowner, such as Plaintiff to appeal to an unbiased decision-maker; and

7.      Afford Plaintiff Jeane Giannakakos all of the foregoing procedural due process.

C.      Award all costs and attorneys' fees; and

D.      Such further relief, including equitable relief, as the Court deemed appropriate.

E.      IF this COURT determines that Defendants violated TILA at the inception, then Plaintiff requests that this  Court find that the alleged Note and Lien are invalid and order as follows:

1.      For immediate cease and desist order enjoining all Defendants, and each of them, their agents, servants, heirs, DBAs, FKAs, corporate affiliates, subsidiaries, employees, and all persons or entities acting under, in concert with, or on their behalf in any capacity from selling or conveying or attempting to sell or convey any interest whatsoever that Plaintiff may have in the real property Subject Property relating to the Loan.

2.      For preliminary injunction and permanent injunction, enjoining all Defendants, and  each of them, their agents, servants, heirs, DBAs, FKAs, corporate affiliates, subsidiaries, employees, and all persons or entities acting under, in concert with, or on their behalf in any capacity from selling or conveying or attempting to sell or convey any interest whatsoever that Plaintiff may have in the real property, Subject Property, relating to the Loan, which is presently unknown to Plaintiff;

3.      That the deed of trust securing the Subject Property and securing the Loan, be rescinded and Plaintiff Deed of Trust immediately restored to Plaintiff;

4.      That Plaintiff credit standing be fully restored in relation to the Loan;

5.      That any and all Notice of Intent to Foreclose issued by any Defendants or agents of Defendants relating Subject Property be rescinded;

6.      That title to the Subject Property, be restored to Plaintiff in the name of Plaintiff and;

7.      That the Loan be forgiven in their entirety;

F.      IF this COURT determines that Plaintiff has a right to properly rescind this Loan, then Plaintiff requests that this Court order:

1.      That Plaintiff credit standing be fully restored in relation to the Loan;

2.      That any and all Notice of Intent to Foreclose issued by any Defendants or agents of Defendants relating Subject Property be rescinded;

3.      That Defendants provide an accounting of all amounts charged to Plaintiff or paid by Plaintiff relating to the Loan;

4.      That Defendants promptly pay said amounts to Plaintiff;

5.      That the Loan and related notes be forgiven in their entirety; and

6.     That Defendants receive and accept title to the Subject Property from Plaintiff.

G.     Under all alternatives, Plaintiff prays:

1.     That this Court grant judgment in favor of Plaintiff against all Defendants;

2.     For all damages and remedies Plaintiff is entitled to recover;

3.     For all damages and remedies Plaintiff is entitled to recover;

4.     For judgment that Plaintiff is entitled to compensation of the full value of the Subject Property;

5.     For compensatory damages according to proof, including lost credit, lost earnings and the employee benefits, medical expenses, emotional distress, humiliation, mental anguish, and the compensatory damages;

6.     For general damages according to proof;

7.     For special damages according to proof;

8.     For interest on damages according to proof;

9.     For prejudgment interest on such damages as provided by law;

10.    For attorney fees incurred by Plaintiff;

11.    For costs of suit incurred by Plaintiff; and

12.    For such further relief as the court deems proper.

Dated:   February 10, 2011

_____
Jeane Giannakakos
Plaintiff in Pro per

_____
Kiriakos Giannakakos
Plaintiff in Pro per

## **VERIFICATION**

I Jeane Giannakakos and Kiriakos Giannakakos have read the foregoing Verified Complaint,

and we attest to the foregoing under penalty of perjury, under the laws of the State of

California. Signed in Santa Ana, California on February 10, 2011.

_____
Jeane Giannakakos

_____
Kiriakos Giannakakos

Exhibit 1

Deed of Trust

UNITED TITLE COMPANY ment

30605804-31

Recording Requested By:

Return To:
**FREMONT INVESTMENT & LOAN
P.O. BOX 34078
FULLERTON, CA  92834-34078**

Prepared By:
**BARBARA LICON**

Recording Requested by
Zang Recording Services on
behalf of : UNI

**1000317878**

Recorded in Official Records, Orange County

Tom Daly, Clerk-Recorder

|||||||||||||||||||||||||||||||||||||     **63.00**

**2006000275213 08:00am 04/25/06**
108 73 D11 20

0.00 0.00 0.00 0.00 57.00 0.00 0.00 0.00

365.062-08

——————————— [Space Above This Line For Recording Data] ———————————

# DEED OF TRUST

MIN  **1001944-1000317878-2**

**DEFINITIONS**
Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) **"Security Instrument"** means this document, which is dated **April 19, 2006**
together with all Riders to this document.
(B) **"Borrower"** is **JEANE GIANNAKAKOS, A MARRIED WOMAN AS HER SOLE AND SEPARATE
PROPERTY**

Borrower's address is **512 S CIRCULO LAZO     , ANAHEIM, CA 92807**
. Borrower is the trustor under this Security Instrument.
(C) **"Lender"** is  **FREMONT INVESTMENT & LOAN**

Lender is a  **CORPORATION**
organized and existing under the laws of  **CALIFORNIA**

**CALIFORNIA**-Single Family-**Fannie Mae/Freddie Mac** UNIFORM INSTRUMENT WITH MERS  Form 3005 1/01

-6A(CA) (0207)
Page 1 of 15                     Initials: ____

VMP MORTGAGE FORMS - (800)521-7291

Lender's address is
**2727 E IMPERIAL HIGHWAY, BREA CA 92821**
(D) "Trustee" is **FREMONT GENERAL CREDIT CORPORATION, A CALIFORNIA CORPORATION**

(E) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) **"Note"** means the promissory note signed by Borrower and dated **April 19, 2006**
The Note states that Borrower owes Lender **Six Hundred Forty-Eight Thousand and No/100 ----------------------------------------------** Dollars
(U.S. $   **648,000.00**   ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   **May 1, 2036**

(G) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [X] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: _____

-6A(CA) (0207)                          Page 2 of 15                          Form 3005  1/01

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
**County**                                        of **ORANGE**                                           :
    [Type of Recording Jurisdiction]                          [Name of Recording Jurisdiction]
**LOT 26 OF TRACT NO. 8375, IN THE CITY OF ANAHEIM, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 348 PAGE(S) 34-38 INCLUSIVE OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.**

Parcel ID Number:      **365-082-08**                           which currently has the address of
**998 S QUINCY CR**                                                             [Street]
**ANAHEIM**                                              [City], California **92807**
("Property Address"):                                                         [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

-6A(CA) (0207)                        Page 3 of 15                Initials: _____        Form 3005  1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10



days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with



the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage**



Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or

any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict

shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

 -6A(CA) (0207)

Page 12 of 15

Initials 

Form 3005   1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**BY SIGNING BELOW,** Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                        _____(Seal)
                                                       JEANE GIANNAKAKOS                    -Borrower

_____                        _____(Seal)
                                                                                            -Borrower

_____(Seal)              _____(Seal)
                         -Borrower                                                          -Borrower

_____(Seal)              _____(Seal)
                         -Borrower                                                          -Borrower

_____(Seal)              _____(Seal)
                         -Borrower                                                          -Borrower

**State of California**
**County of** *Orange*                                              } ss.

On *April 20, 2006* before me, *Karen M. Shulman*
personally appeared

*Jeane Giannakakos*

(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

, personally known to me

WITNESS my hand and official seal.

 _____ (Seal)

KAREN M. SHULMAN
COMM. #1390485
Notary Public-California
ORANGE COUNTY
My Comm. Exp. Dec 16, 2008

# ADJUSTABLE RATE AND BALLOON PAYMENT RIDER
(LIBOR Six-Month Index (As Published in The Wall Street Journal) - Rate Caps)

THIS ADJUSTABLE RATE AND BALLOON PAYMENT RIDER (the "Security Instrument Rider") is made this **19th** day of **April, 2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **FREMONT INVESTMENT & LOAN** ("Lender") of the same date and covering the property described in the Security Instrument and located at:

**998 S QUINCY CIRCLE   ANAHEIM, CA 92807**
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY. THE NOTE IS PAYABLE IN FULL AT MATURITY. BORROWER MUST REPAY THE ENTIRE UNPAID PRINCIPAL BALANCE OF THE NOTE, TOGETHER WITH ALL UNPAID INTEREST AND LOAN CHARGES THEN DUE, IN A SINGLE BALLOON PAYMENT. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE NOTE AT THAT TIME. BORROWER WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT BORROWER MAY OWN, OR BORROWER WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER NAMED IN THE NOTE, WILLING TO LEND BORROWER THE MONEY. IF BORROWER REFINANCES THE NOTE AT MATURITY, BORROWER MAY HAVE TO PAY HIGHER INTEREST RATES ON THE NEW LOAN THAN ARE PAID ON THE NOTE. FURTHER, IF BORROWER REFINANCES, BORROWER MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF BORROWER OBTAINS REFINANCING FROM THE SAME LENDER.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.    **Interest Rate and Monthly Payment Changes**

Section 2 of the Note provides for an initial interest rate of **7.4500** % and states that the interest rate of the Note will change in accordance with Section 4 of the Note. Borrower has executed a Balloon Payment Rider to Note (the "Note Rider") dated the same date as this Security Instrument Rider. Among other things, the Note Rider modifies, amends, and supplements Sections 3 and 4 of the Note to read, in their entirety, as follows:

BALARMRD   rg 1/05/06

p. 1 of 4

3. **PAYMENTS**

   (A)   **Time and Place of Payments**

       I will pay principal and interest by making a payment every month.

       I will make my monthly payment on the first day of each month beginning on **June 1, 2006**

       I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. On **May 1, 2036** (which is called the "Maturity Date"), I will pay the entire unpaid Principal balance of this Note, together with all accrued and unpaid interest and all charges due under this Note, in a single payment (the "Balloon Payment"). I understand and acknowledge that the Balloon Payment due on the Maturity Date will be much larger than a regular monthly payment and that the Note Holder has no obligation to refinance the Balloon Payment.

       I will make my monthly payments at **2727 E IMPERIAL HIGHWAY, BREA CA 92821** or at a different place if required by the Note Holder.

   (B)   **Amount of Monthly Payments**

       Each of my initial monthly payments will be in the amount of U.S. **$4,240.38** . This amount may change.

   (C)   **Monthly Payment Changes**

       Changes in my monthly payment will reflect changes in the unpaid Principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

4. **INTEREST RATE AND MONTHLY PAYMENT CHANGES**

   (A)   **Change Dates**

       The interest rate I will pay may change on the first day of **May , 2008** , and may change on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

   (B)   **The Index**

       Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR"), which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available 45 days before each Change Date is called the "Current Index."

       If the Index is no longer available, the Note Holder will choose a new index and adjust the Margin described below. The Note Holder will give me notice of these changes.

   (C)   **Calculation of Changes**

       Before each Change Date, the Note Holder will calculate my new interest rate by adding **Five and Three Hundred Seventy-Nine Thousandths** percentage point(s) ( **5.3790** %) (the "Margin")to the CurrentIndex. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

       The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on **May 1, 2046** at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)   Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **9.450** % or less than **7.4500** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One and One-Half** percentage point(s) ( **1.5000** %) from the rate of interest I have been paying for the preceding six months. In any event, my interest rate will never be greater than **13.4500** % and will never be less than **7.4500** %.

**(E)   Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)   Notice of Changes**

The Note Holder will deliver or mail to me such notice of any changes in my interest rate and monthly payment as may be required by law. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice."

**B.   Effect of Note Rider**

The Note Rider contains the following provisions:

"This Note Rider modifies, amends and supplements the Note. To the extent of any inconsistency between the provisions of this Note Rider and the provisions of the Note, the provisions of this Note Rider shall prevail over and supersede the inconsistent provisions of the Note. Except as modified, amended or supplemented by this Note Rider, the Note shall remain in full force and effect."

**C.   Transfer of the Property or a Beneficial Interest in Borrower**

1. **Until Borrower's initial interest rate changes under the terms described in Section A above, Uniform Covenant 18 of the Security Instrument shall be in effect as follows:**

"**Transfer of the Property or a Beneficial Interest in Borrower.**" As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower."

BALARMR3  rg  1/05/06                     p. 3 of 4

**2.**    After Borrower's initial interest rate changes under the terms described in Section A above, Uniform Covenant 18 of the Security Instrument described in Section C.1. above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall then be modified, amended and supplemented to read, in its entirety, as follows:

"Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.
Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower."

**BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate And Balloon Payment Rider.**

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

[Sign Original Only]

BALARMR4  rg  1/05/06                    p. 4 of 4

## UNITED TITLE COMPANY

### PENALTY OF PERJURY AFFIDAVIT
(GOVERNMENT CODE 27361.7)

I certify under the penalty of perjury that the notary seal on the document to which this statement is attached reads as follows:

Name of the Notary:  KAREN M. SHULMAN

Date Commission expires:  DEC. 16, 2006

County Where Bond is Filed:  ORANGE

Commission No.: 1390485  Manufacturer/Vendor No.: ESI1

Place of Execution: _Newport Beach, Ca._ Date: 4/24/2006

Signature: _____
UNITED TITLE COMPANY

_____

I further certify under the penalty of perjury that the illegible portion of the document to which this statement is attached reads as follows (if applicable):

Date: _____, 2005

Signature: _____
UNITED TITLE COMPANY

1301 Dove Street Suite 300, Newport Beach, CA 92660 (949) 724-3838

4

# UNITED TITLE COMPANY

30605804 - 31

Recording Requested By:

Return To:
**FREMONT INVESTMENT & LOAN
P.O. BOX 34078
FULLERTON, CA 92834-34078**

Prepared By:
**BARBARA LICON**

**1000318135**

Recorded in Official Records, Orange County
Tom Daly, Clerk-Recorder

**51.00**

**2006000275214 08:00am 04/25/06**
108 73 D11 16

0.00 0.00 0.00 0.00 45.00 0.00 0.00 0.00

Recording Requested by
Zang Recording Services on
behalf of : UNI

365-082-08

———————————— [Space Above This Line For Recording Data] ————————————

# DEED OF TRUST

MIN  **1001944-1000318135-6**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "**Security Instrument**" means this document, which is dated **April 19, 2006**
together with all Riders to this document.
(B) "**Borrower**" is **JEANE GIANNAKAKOS, A MARRIED WOMAN AS HER SOLE AND SEPARATE
PROPERTY**

> THIS DEED OF TRUST IS SECOND
> AND SUBORDINATE TO A DEED OF
> TRUST RECORDING CONCURRENTLY
> HEREWITH

Borrower's address is **512 S CIRCULO LAZO    , ANAHEIM, CA 92807**

. Borrower is the trustor under this Security Instrument.

(C) "**Lender**" is   **FREMONT INVESTMENT & LOAN**

Lender is a   **CORPORATION**
organized and existing under the laws of   **CALIFORNIA**

**CALIFORNIA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS   Form 3005  1/01**

-6A(CA) (0207)
Page 1 of 15                    Initials:

VMP MORTGAGE FORMS - (800)521-7291

**SECOND MORTGAGE**

Lender's address is
**2727 E IMPERIAL HIGHWAY, BREA CA 92821**
**(D) "Trustee"** is   **FREMONT GENERAL CREDIT CORPORATION, A CALIFORNIA CORPORATION**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated   **April 19, 2006**
The Note states that Borrower owes Lender **One Hundred Sixty-Two Thousand and No/100 ------------------------------------------------------**
                                                                                                Dollars
**(U.S. $      162,000.00**      ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   **May 1, 2036**

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County** of **ORANGE** :

    [Type of Recording Jurisdiction]        [Name of Recording Jurisdiction]

**LOT 26 OF TRACT NO. 8375, IN THE CITY OF ANAHEIM, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 348 PAGE(S) 34-38 INCLUSIVE OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.**

Parcel ID Number:
**998 S. QUINCY CR
ANAHEIM**
("Property Address"):

which currently has the address of

               [Street]

[City], California **92807**
          [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage**

Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or

any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict

shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA



requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                   **JEANE GIANNAKAKOS**           -Borrower

_____          _____ (Seal)
                                                               -Borrower

_____ (Seal)   _____ (Seal)
                -Borrower                              -Borrower

_____ (Seal)   _____ (Seal)
                -Borrower                              -Borrower

_____ (Seal)   _____ (Seal)
                -Borrower                              -Borrower

State of California
County of _Orange_

On _April 29, 2006_ before me, _Karen M. Shulman_ } ss.

personally appeared

_Jeane Giannakakos_

(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

, personally known to me

WITNESS my hand and official seal.

_____ (Seal)

KAREN M. SHULMAN
COMM #1380485
Notary Public-California
ORANGE COUNTY
My Comm. Exp. Dec 16, 2006

-6A(CA) (0207)

Page 15 of 15

Initials: _____

Form 3005   1/01

**UNITED TITLE COMPANY**

**PENALTY OF PERJURY AFFIDAVIT**
**(GOVERNMENT CODE 27361.7)**

I certify under the penalty of perjury that the notary seal on the document to which this statement is attached reads as follows:

Name of the Notary:  KAREN M. SHULMAN

Date Commission expires:  DEC. 16, 2006

County Where Bond is Filed:  ORANGE

Commission No.: 1390485   Manufacturer/Vendor No.: ESI1

Place of Execution: Newport Beach, Ca.  Date: 4/24/2006

Signature: _____
UNITED TITLE COMPANY

---

I further certify under the penalty of perjury that the illegible portion of the document to which this statement is attached reads as follows (if applicable):

Date: _____ , 2005

Signature: _____
UNITED TITLE COMPANY

1301 Dove Street Suite 300, Newport Beach, CA 92660 (949) 724-3838

Exhibit 2

Assignment of
Deed of TRUST

Recording requested by:

When recorded mail to:

Litton Loan Servicing LP
4828 Loop Central Drive
Houston, TX 77081

**Recorded in Official Records, Orange County**

**Tom Daly, Clerk-Recorder**

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖    **6.00**

**2008000593757 10:54am 12/30/08**

105 49 A32 1

0.00 0.00 0.00 0.00 0.00 0.00 0.00 0.00

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

Space above this line for recorders use

TS # CA-08-212728-JB
MERS MIN No.:
100194410003178782

Order # 080074560-CA-MAI

Loan # 40421968
Investor No. 1000317878

## Assignment of Deed of Trust

For value received, the undersigned corporation hereby grants, assigns, and transfers to

**HSBC Bank USA, National Association, as Trustee, under the Pooling and Servicing Agreement dated August 1, 2006, ACE Securities Corp. Home Equity Loan Trust, Series 2006-FM1, Asset Backed Pass-Through Certificates**

all beneficial interest under that certain Deed of Trust dated **4/19/2006** executed by **JEANE GIANNAKAKOS, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY**, as Trustor(s) to **FREMONT GENERAL CREDIT CORPORATION, A CALIFORNIA CORPORATION**, as Trustee and recorded as Instrument No. **2006000275213**, on **4/25/2006**, in Book **xxx**, Page **xxx** of Official Records, in the office of the County Recorder of **ORANGE** County, **CA** together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

Dated:  11/11/2008 8:43 AM

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FREMONT INVESTMENT & LOAN

By: _Denise Bailey_

Denise Bailey

Assistant Secretary

State of _Texas._ )
County of _Harris_ )

On_DEC 11 2008_before me, _Leigh Blackwell_ a notary public
,personally appeared_Denise Bailey_, who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Leigh Blackwell_ (Seal)



LEIGH BLACKWELL
Notary Public, State of Texas
My Commission Expires
March 30, 2011

TS No.: CA-08-212728-JB
Loan No.: 40421968
**Notice of Default and Election To Sell Under Deed of Trust**

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.  Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

Remember, **YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

NOTICE IS HEREBY GIVEN: That the undersigned is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated 4/19/2006, executed by JEANE GIANNAKAKOS, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY, as Trustor, to secure certain obligations in favor of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FREMONT INVESTMENT & LOAN, as beneficiary, recorded 4/25/2006, as Instrument No. 2006000275213, in Book xxx, Page xxx of Official Records in the Office of the Recorder of  ORANGE County, California describing land therein: **as more fully described in said Deed of Trust.**

Said obligations including 1 NOTE(S) FOR THE ORIGINAL sum of $648,000.00, that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

Installment of principal and interest plus impounds and advances which became due on 7/1/2008 plus amounts that are due or may become due for the following: late charges, delinquent property taxes, insurance premiums, advances made on senior liens, taxes and/or insurance, trustees fees, and any attorney fees and court costs arising from or associated with beneficiaries effort to protect and preserve its security must be cured as a condition of reinstatement.

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The Beneficiary or its designated agent declares that it has contacted the borrower, tried with due diligence to contact the borrower as required by California Civil Code § 2923.5, or the borrower has surrendered the property to the beneficiary or authorized agent, or is otherwise exempt from the requirements of § 2935.5.

Dated: 11/13/2008      **Quality Loan Service Corp., AS AGENT FOR BENEFICIARY**
BY: LSI Title Company, as Agent

Merrlyn L. Aguas

If you have previously been discharged through bankruptcy, you may have been released of personal liability for this loan in which case this letter is intended to exercise the note holder's rights against the real property only.

**THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit report agency if you fail to fulfill the terms of your credit obligations.

Exhibit 3

Substitution of Trustee
Invalid

Recording requested by:

When recorded mail to:

Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101
619-645-7711

Recorded in Official Records, Orange County

Tom Daly, Clerk-Recorder

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖    **12.00**

**2008000588995 11:50am 12/24/08**
117 91 S15 3

0.00 0.00 0.00 0.00 6.00 0.00 0.00 0.00

---

TS # CA-08-212728-JB
MERS MIN No.:
100194410003178782

Order # 080074560-CA-MAI

Space above this line for recorders use

Loan # 40421968

## Substitution of Trustee

WHEREAS, JEANE GIANNAKAKOS, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY was the original Trustor, FREMONT GENERAL CREDIT CORPORATION, A CALIFORNIA CORPORATION was the original Trustee, and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FREMONT INVESTMENT & LOAN was the original Beneficiary under that certain Deed of Trust dated 4/19/2006 and recorded on 4/25/2006 as Instrument No. 2006000275213, in book xxx, page xxx of Official Records of ORANGE County, CA; and

WHEREAS, the undersigned is the present Beneficiary under said Deed of Trust, and

WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in place and stead of said original Trustee, or Successor Trustee, thereunder, in the manner provided for in said Deed of Trust.

NOW, THEREFORE, the undersigned hereby substitutes QUALITY LOAN SERVICE CORPORATION ,as Trustee under said Deed of Trust.

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

Page 1

Substitution of Trustee - CA
TS # CA-08-212728-JB
Page 2

Dated: 11/13/2008

HSBC Bank USA, National Association, as Trustee, under
the Pooling and Servicing Agreement dated August 1,
2006, ACE Securities Corp. Home Equity Loan Trust,
Series 2006-FM1, Asset Backed Pass-Through
Certificates

By: _____
Diane Dixon
Assistant Vice President

LITTON LOAN SERVICING LP
ATTORNEY-IN-FACT

State of Texas )
County of Harris )

On 12/04/08 Date before me, _____ a notary public,  personally
appeared          Diane Dixon                                    who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

BRENDA MCKINZY
Notary Public, State of Texas
My Commission Expires
December 08, 2010

## Affidavit of Mailing
### for Substitution of Trustee By Code

TS No.: **CA-08-212728-JB**
Trustor: JEANE GIANNAKAKOS, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY

I, Gisselle De La Torre, declare: That I am an employee of **Quality Loan Service Corp.**, an agent for beneficiary, whose business address is:

> 2141 5th Avenue
> San Diego, CA 92101

I am over the age of eighteen years and in accordance with California Civil Code Section 2934, I caused a copy of the attached Substitution of Trustee to be mailed, in the manner provided in Section 2924(b) of the Civil Code of the State of California, to the trustee of record under the Deed of Trust described in said Substitution and to all persons to whom a copy of the Notice of Default would be required to be mailed by the provisions of said section.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at San Diego, CA on 12/9/2008.

Gisselle De La Torre



Exhibit 4

Diagram of

Fremont Investments +

Loan involvment with

Securtization



| Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number | FOR COURT USE ONLY |
|---|---|

*Attorney for Plaintiff*

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA**

In re:  *Linalos Giannatakos
Jean e Giannatakos*
                                                              Debtor.

CHAPTER *13*

CASE NUMBER  *8:10-bk-22678-RK*

ADVERSARY NUMBER

*Jean Giannatakos* et al.
*Linalos Giannatakos*                                  Plaintiff(s).
*HSBC Bank USA*
*Fremont General Corp.*                            Defendant(s)

*(The Boxes and Blank Lines below are for the Court's Use Only) (Do Not Fill Them In)*

**SUMMONS AND NOTICE OF
STATUS CONFERENCE**

TO THE DEFENDANT: A Complaint has been filed by the Plaintiff against you. If you wish to defend yourself, you must file with the Court a written pleading, in duplicate, in response to the Complaint. You must also send a copy of your written response to the party shown in the upper left-hand corner of this page. Unless you have filed in duplicate and served a responsive pleading by _____, the Court may enter a judgment by default against you for the relief demanded in the Complaint.

A Status Conference on the proceeding commenced by the Complaint has been set for:

| Hearing Date: | Time: | Courtroom: | Floor: |
|---|---|---|---|
| ❑  **255 East Temple Street, Los Angeles** | | ❑  **411 West Fourth Street, Santa Ana** | |
| ❑  **21041 Burbank Boulevard, Woodland Hills** | | ❑  **1415 State Street, Santa Barbara** | |
| ❑  **3420 Twelfth Street, Riverside** | | | |

PLEASE TAKE NOTICE that if the trial of the proceeding is anticipated to take less than two (2) hours, the parties may stipulate to conduct the trial of the case on the date specified, instead of holding a Status Conference. Such a stipulation must be lodged with the Court at least two (2) Court days before the date set forth above and is subject to Court approval. The Court may continue the trial to another date if necessary to accommodate the anticipated length of the trial.

Date of Issuance: _____

**JON D. CERETTO**
**Clerk of the Bankruptcy Court**

By: _____

*Deputy Clerk*

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 7004-1**

*Revised December 1998 (COA-SA)*

**B104 (FORM 104) (08/07), Page 2**

| NAME OF DEBTOR _HSBC Bank USA_ _Fremont General Corp_ | BANKRUPTCY CASE NO. _8:10-bk-23078-RK_ | |
|---|---|---|
| DISTRICT IN WHICH CASE IS PENDING _Central_ | DIVISION OFFICE | NAME OF JUDGE _Robert Kwan_ |
| PLAINTIFF _Nicole Gannalate_ _Jesse Gannalate_ | DEFENDANT _HSBC Bank USA_ _Fremont General Corp_ | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | |
|---|---|
| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.